FILED
COURT OF APPEALS
DIVISION II

2014 APR 24 AM 10: 47

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Welfare of: | No. 44595-6-II |
| | Consolidated with |
| L.R. and A.H., | No. 44598-1-II |
| | |
| Minor Children. | PART PUBLISHED OPINION |

MAXA, J. – D.R. appeals the trial court's order terminating her parental rights as to two of her children, L.R. and A.H.[1]  She argues that the trial court violated her due process rights by proceeding with the first day of the termination trial even though she was not present.  We hold that although conducting a termination hearing without the parent present raises due process concerns, the trial court did not violate D.R.'s due process rights under the facts of this case and in light of the procedural safeguards the trial court implemented.

D.R. also argues that the Department of Social and Health Services (Department) failed to prove that continuation of the parent-child relationship diminished the children's prospects for integration into a stable and permanent home.  In the unpublished portion of this opinion we adopt verbatim the commissioner's recitation of facts and ruling that former RCW

---

[1] Our commissioner considered this appeal on an accelerated basis under RAP 18.13A and affirmed the trial court's termination order.  We granted DR's motion to modify the commissioner's ruling in order to address DR's due process argument.

13.34.180(1)(f) (2009) supported the trial court's termination of D.R.'s parental rights. Accordingly, we affirm.

## PROCEDURAL FACTS

D.R. is the mother of L.R., born in 2010; and A.H., born in 2004. On July 26, 2011, the children were found dependent, and on March 23, 2012, the Department filed petitions for termination of the parent-child relationship as to both children. The termination trial originally was scheduled for October 17, 2012. However, trial was continued to November 14, then to January 16, 2013, and finally to January 24.

When the termination trial began at Remann Hall in Tacoma, D.R. was incarcerated at the Washington Corrections Center for Women in Purdy. Because D.R. wanted to attend the trial in person, she moved for an order of transport and a trial continuance so that she could be transported from the corrections center to Remann Hall for the trial. D.R.'s attorney told the trial court that it would take approximately two weeks to arrange for transportation.

The Department did not object to a short continuance of the termination trial, but stated that it did not want a lengthy delay because the case already had been continued multiple times. The Department also expressed uncertainty as to whether an inmate could be transported to Remann Hall as opposed to the superior court in downtown Tacoma.

The trial court stated:

> I'm disinclined to grant the continuance. This was set to this time with the idea that it would be tried. The fact that there's now a problem with transport is unfortunate, but really is not anything that, it sounds like, we could even guarantee is going to be accommodated once we got your client transported from wherever she is to the Pierce County Jail. We still have to have her either come out here or we have to find somebody downtown, which is highly unlikely, because we've got cases now that can't get out. We've got a number of offender cases that we're asking them to preassign downtown, so it doesn't sound like

there's any good guarantee that we could arrange all the moving parts of this in any quick fashion.

Report of Proceedings (RP) (Jan. 24, 2013) at 8.

The trial court took a recess to look at its trial schedule. It then denied the motions, stating that there was no guarantee that D.R.'s transport request could be arranged in a timely manner or even accommodated at all. The trial court continued:

> [T]he transport, the more I think about it, is, I think, a completely problematic event, because even if we get her transported over here, I am absolutely convinced they are not going to transport her out to Remann Hall, and I think it highly unlikely that they would transport her even to one of the courtrooms for trial since this is a civil matter and they have all the criminal matters deemed priority. I think it very, very unlikely that there would be any arrangements made to get her to a trial downtown. And even if we did it downtown, that means we'd have to find a judge available because of their need to hear it in the County-City Building, and that's going to be problematic. So, this trial is doomed to float if we don't get it going now.

RP (Jan. 24, 2013) at 13-14. D.R. does not assign error to the trial court's denial of her motion for a continuance or her motion for transport.

D.R.'s attorney next attempted to secure D.R.'s presence by telephone. The parties previously had made arrangements with D.R.'s corrections officer to have D.R. available to appear telephonically for trial. But when the State called the corrections officer, she said that she was leaving work that day and gave the State the contact information for a different corrections officer. When D.R.'s counsel attempted to contact that corrections officer, counsel was unable to reach him.

D.R.'s attorney renewed his objection to commencing trial without D.R.'s presence in person or telephonically. The trial court again denied the request and stated:

> It would be preferable to have her available, preferably, in person, secondarily, on the phone, but these are matters that have been known to the parties throughout the proceeding. This case has been set for enough time to have arranged phone

3

contact, or if there was any hope of in-person presence, that would have been arranged by now also. And as I indicated earlier, with no indication that those things can be accomplished, if at all, and certainly not any time in the foreseeable future, we are going to proceed.

RP (Jan 24, 2013) at 16. That day, the trial court heard testimony from a Department social worker who was subjected to cross-examination by D.R.'s attorney.

The trial continued on January 28 and February 7, and D.R. was able to appear telephonically on both days. On January 28, D.R. moved for a mistrial, arguing that the trial court violated her due process rights by denying her the ability to attend the first day of trial telephonically or in person. She argued that her absence curtailed her attorney's effectiveness in cross-examining the social worker. The trial court denied the motion, stating that D.R. had placed herself in the position of not being able to attend because of her criminal behavior. The trial court further reasoned that D.R.'s request for transport was made on the first day of trial and that it was uncertain whether she could be transported to Remann Hall or to any other facility outside of the Department of Corrections.

After denying D.R.'s mistrial motion, the trial court permitted recesses following each witness's testimony to allow D.R. to speak privately with her attorney. On the last day of trial, the court allowed D.R.'s attorney to recall the social worker to the stand to conduct another cross-examination with D.R. present telephonically. After trial, the trial court entered orders terminating D.R.'s parental rights as to the children.

## ANALYSIS

### DUE PROCESS RIGHT TO ATTEND TERMINATION TRIAL

D.R. argues that the trial court violated her due process rights by proceeding with the first day of the termination trial without her physical or telephonic presence. We disagree.

1. Standard of Review

D.R. does not assign error to the trial court's denial of her motion to transport or its denial of her motion for a continuance. Instead, she argues only that proceeding with the termination trial in her absence violated her due process rights.

Division One of this court has suggested that the decision to proceed with a termination trial in the absence of the parent rests in the trial court's sound discretion. *In re Interest of Darrow*, 32 Wn. App. 803, 808-09, 649 P.2d 858 (1982); *see also In re Dependency of J.W.*, 90 Wn. App. 417, 429, 953 P.2d 104 (1998) (citing *Darrow* in context of dependency disposition hearing). However, we review de novo alleged due process violations. *Post v. City of Tacoma*, 167 Wn.2d 300, 308, 217 P.3d 1179 (2009). Accordingly, here we use the de novo standard of review to address D.R.'s due process argument.

2. Due Process Balancing Analysis

Preservation of the family unit is a fundamental constitutional right protected by the Fourteenth Amendment of the United States Constitution. *Darrow*, 32 Wn. App. at 806 (citing *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978)). "Because of the constitutional interests at stake in a termination proceeding, parents are afforded greater due process rights than in dependency proceedings or other proceedings to determine the custody or placement of children." *In re Welfare of R.H.*, 176 Wn. App. 419, 425, 309 P.3d 620 (2013). Due process in the termination context requires that parents have notice, an opportunity to be heard and defend, and the right to be represented by counsel. *In re Welfare of S.E.*, 63 Wn. App. 244, 250, 820 P.2d 47 (1991).

The right to be heard "ordinarily includes the right to be present." *In re Welfare of Houts*, 7 Wn. App. 476, 481, 499 P.2d 1276 (1972). However, there is no absolute right for an

incarcerated parent to personally attend a termination proceeding or to appear telephonically. *In re Dependency of M.S.*, 98 Wn. App. 91, 94-96, 988 P.2d 488 (1999); *see also Darrow*, 32 Wn. App. at 808 ("The right to appear *personally* and defend is not guaranteed by due process so long as the prisoner was afforded an opportunity to defend through counsel and by deposition or similar evidentiary techniques."). For instance, the parent's right to be heard is not self-executing and he or she must take reasonable and timely steps to exercise that right. RCW 13.34.090; *M.S.*, 98 Wn. App. at 96. But under certain circumstances a parent's due process rights might require his or her attendance. *See S.E.*, 63 Wn. App. at 248-49 (conducting due process analysis but concluding that taking testimony of children outside the presence of their parents did not violate the parents' due process rights)..

In determining whether a parent has received adequate due process, we must balance the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). *In re Dependency of C.R.B.*, 62 Wn. App. 608, 614-15, 814 P.2d 1197 (1991). The *Mathews* balancing test requires weighing: (1) the parent's interests, (2) the risk of error created by the procedures used, and (3) the State's interests. *C.R.B.*, 62 Wn. App. at 614-15; *see also J.W.*, 90 Wn. App. at 429 (*Mathews* factors used to determine adequacy of procedure in dependency hearing). Here, a balancing of these factors supports the trial court's decision to proceed with the first day of the termination hearing in D.R.'s absence.

a.  D.R.'s Interest

D.R. has a fundamental liberty interest in the care and custody of her children. *In re Dependency of K.D.S.*, 176 Wn.2d 644, 652, 294 P.3d 695 (2013). " '[C]ourts undertake a grave responsibility when they deprive parents of the care, custody and control of their natural children.' " *S.E.*, 63 Wn. App. at 249-50 (alteration in original) (quoting *In re Welfare of Sego*,

6

82 Wn.2d 736, 738, 513 P.2d 831 (1973)). Therefore, "[t]erminating parental rights is one of the severest of state actions and implicates fundamental interests." *In re Welfare of J.M.*, 130 Wn. App. 912, 921, 125 P.3d 245 (2005).

The Department recognizes the strength of this interest and does not dispute its importance here. However, the right to be present is not absolute and must be balanced against the other two *Matthews* factors. *M.S.*, 98 Wn. App. at 95. In addition, here the infringement on D.R.'s interest involved her inability to attend only the first day of the three-day hearing.

b.    Risk of Error

The second factor assesses whether the hearing had sufficient procedural safeguards to insure that the parent had a full and fair opportunity to defend – i.e., to present evidence, rebut opposing evidence, and present legal arguments. *See J.W.*, 90 Wn. App. at 428-29; *S.E.*, 63 Wn. App. at 250-51; *Darrow*, 32 Wn. App. at 808-09. The ability to defend through counsel reduces the risk of error. *See J.W.*, 90 Wn. App. at 428-29.

The other divisions of this court have indicated that the risk of error is low when the absent parent is represented by counsel and counsel is given a fair opportunity to defend the parent. In *J.W.*, Division One of this court held that conducting a dependency disposition hearing without the father present did not violate due process. 90 Wn. App. at 428-29. The court held that the father's absence created little room for error where no facts were disputed and the father's counsel argued legal issues after fully discussing them beforehand with the father. *J.W.*, 90 Wn. App. at 428-29. In *Darrow*, Division One held that the trial court did not violate the father's due process rights by denying his order of transport to be physically present at a termination trial because the father "was afforded a full opportunity to defend in a fair hearing while represented by counsel." 32 Wn. App. at 809.

7

In *S.E.*, Division Three of this court held that the trial court did not violate the parents' due process rights when it excluded them from a termination hearing at which their children testified. 63 Wn. App. at 251. The court held that the risk of error created by the procedure was low because "[a] record of the proceeding was made and counsel and the guardian ad litem were present, had an opportunity to cross-examine the children, did so, and had an opportunity to rebut the children's testimony by other evidence." *S.E.*, 63 Wn. App. at 250.

As in these cases, there was little risk of error here. D.R. was represented by counsel throughout the termination proceeding and had the opportunity to be heard and defend. D.R.'s attorney was present on the first day of trial to listen to the social worker's testimony and to cross-examine her. On the remaining days of trial, D.R. appeared telephonically and was able to privately consult with her attorney before cross-examining witnesses. On the final day of trial, D.R., who was present telephonically, was given the opportunity to testify and to offer other evidence. In addition, the trial court permitted D.R. to recall the social worker as a witness when D.R. was present telephonically and to cover topics previously addressed. These were sufficient procedural safeguards to insure that D.R. had a full and fair opportunity to defend despite her absence.

Further, D.R. does not identify how her telephonic presence on the first day of trial would have resulted in any different or additional evidence relevant to the factual issues resolved by the trial court. D.R. also has not shown how she was prejudiced by her attorney's inability to consult with her on the first day of trial, especially where the social worker was recalled as a witness

8

once D.R. was present telephonically.[2] Accordingly, the risk of error factor does not support a finding of a due process violation.

    c.    State's Interest

Regarding the final *Mathews* factor, the Department has a strong interest in protecting the rights of the children, which includes a speedy resolution of the termination proceeding. *M.S.*, 98 Wn. App. at 95. "[T]he State and the child have a strong interest not only in establishing a stable and permanent home for the child, but also in doing it as soon as possible." *C.R.B.*, 62 Wn. App. at 615; *see also* RCW 13.34.020 ("The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.").

Here, the termination trial already had been continued three times from its originally scheduled date of October 2012. Further, the trial court checked its trial schedule before denying the continuance motion and apparently determined that granting another continuance would cause scheduling problems. The court stated that "this trial is doomed to float if we don't get it going now." RP (Jan. 24, 2013) at 14. Finally, there was no guarantee that D.R. could have been transported to the hearing or even been available by telephone if the trial court allowed a continuance. As such, DSHS had a strong interest in proceeding with the hearing on January 24, 2013, rather than allowing any further delay.

    d.    Balancing of Factors

The balancing of the *Matthews* factors demonstrates that D.R.'s absence from the first day of the termination hearing did not violate her due process rights. Although D.R. had a strong

---

[2] Although lack of prejudice often is part of a harmless error analysis, here it relates to the risk of error prong of the *Mathews* test.

interest in attending, her right to be present is not absolute and she only missed one day of a three-day hearing. And the State also had a compelling interest in not delaying the proceedings any further. Most significantly, D.R. was represented by counsel and the procedural safeguards the trial court put into place served to reduce or eliminate any risk of error and any prejudice in proceeding without her. We hold that the balancing process does not support a finding that D.R.'s due process rights were violated.

We are aware that D.R. was prevented from attending the first day of the hearing through no fault of her own. We also note the apparent lack of coordination in providing transport for a parent in custody who is facing a termination proceeding. It is troubling that the arrangements that had been made for D.R. to attend via telephone fell through because the corrections officer serving as the contact could not be reached. This lack of cooperation and effort could lead to a due process violation when interests as fundamental as those involved in termination proceedings are at stake. Under these circumstances, the better practice may have been to continue the trial to allow the parent to attend telephonically. However, because the trial court's procedures here minimized the risk of error to the extent described above, we find no due process violation and defer to the trial court's discretion regarding whether a continuance was warranted.

We hold that the trial court did not violate D.R.'s due process rights by conducting the first day of the termination hearing without her present.

We consider D.R.'s remaining argument in the unpublished portion of this opinion. We affirm the trial court's termination of D.R.'s parental rights.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

10

In the unpublished portion of this opinion, we adopt verbatim the commissioner's ruling addressing and rejecting D.R.'s remaining argument that there was not substantial evidence to support the trial court's finding that former RCW 13.34.180(1)(f) supported termination of D.R.'s rights.

SUFFICIENCY OF EVIDENCE UNDER FORMER RCW 13.34.180(1)(f)

1. Additional Facts

We adopt verbatim the following facts from the commissioner's ruling:

> On May 11, 2011, law enforcement placed L.R. and A.H. in protective custody after D.R. was arrested for a probation violation. Prior to D.R.'s arrest, the Department received a referral from law enforcement in March 2011 that D.R. and L.R.'s father were involved in a domestic violence dispute. The officer was concerned for L.R.'s safety because D.R. was holding him when the assault occurred. In addition, the Department received a referral in early May 2011 that D.R. was neglecting to seek medical attention for L.R., who had a sore on his groin. On May 16, 2011, the Department filed dependency petitions as to L.R. and A.H. because of concerns regarding D.R.'s ability to care for them due to her drug and alcohol use and mental health issues. A.H. was placed with his paternal grandmother, D.H., and J.R. was placed with his paternal grandparents, S.M. and W.M., Jr.
>
> D.R. agreed to the dependencies of L.R. and A.H. on July 26, 2011, and the juvenile court ordered continued out-of-home placement for the children with their grandparents. As for services, the juvenile court required D.R. to: (1) participate in a drug and alcohol evaluation, an anger management evaluation, and a parenting evaluation; (2) provide random urinalysis samples; (3) maintain suitable and appropriate housing for herself and the children; (4) keep the Department and guardian ad litem . . . updated on her progress in services; and (5) resolve any and all outstanding criminal issues and maintain law abiding behavior. The juvenile court permitted D.R. to have supervised visitation with the children twice per week.
>
> During the dependency, D.R. continued to engage in criminal activity. On December 2, 2011, she pleaded guilty to committing identity theft in October 2011, and the court sentenced her to an additional 12 months of community custody. On February 9, 2012, D.R. was arrested for another probation violation and was incarcerated for 30 days. On May 18, 2012, D.R. was arrested for committing additional acts of identity theft in February and May 2012. In August 2012, she pleaded guilty to eight counts of identity theft, and the court sentenced her to a 50-month drug offender sentencing alternative . . . . The earliest possible date D.R. could be released from incarceration was April 2013, if she was found eligible for work release. Although D.R. initially attended parent-child visits on a regular basis, she stopped visiting the children altogether in January 2012 because she had warrants out for her arrest and did not want to be arrested

in front of them. As of the termination trial, D.R. remained incarcerated and still had not seen the children since January 2012.

In March 2012, the juvenile court changed L.R.'s and A.H.'s primary permanent plan to adoption, and home studies for adoption were ordered for both placements. By November 19, 2012, A.H.'s home study had been completed and approved. L.R.'s was still in the process of being completed.

. . . .

[On the first day of the termination trial] the juvenile court heard testimony from the Department social worker, Nina Jackson, and D.R.'s attorney was given the opportunity to cross-examine her.

. . . .

Jackson testified about the numerous services she offered to D.R. prior to her incarceration and D.R.'s failure to engage in any of the services. In addition, Jackson noted that [L.R.] and A.H. had remained in the same placements with their grandparents since May 2011. She believed that L.R. was thriving in his placement as he had become more verbal since first coming into the Department's care and was hitting milestones. Jackson also believed that A.H. was doing well in his placement and that she was meeting all of his needs. She stated that A.H. was in third grade and, although he had been behind for a little while, he was now reading at his grade level. Jackson further stated the grandparents were willing to adopt the children if they became legally free.

Jackson did not recommend returning the children to D.R.'s care in the near future, as she had not seen the children since January 2012 and had no established relationship with them. She stated that A.H. became very upset when he thought about D.R. and questioned why D.R. would want to see him and [L.R.] when she did not previously take the opportunity to do so. Jackson also stated that [L.R.] had no bond with D.R. since he had been removed from her care when he was only five months old. She did not know what affect visitation would have on the children, especially because [L.R.] did not know D.R., and she believed that [A.H.] would be confused by the situation.

The children's [guardian ad litem] testified that she had seen L.R. and A.H. a number of times during the dependency. She stated that L.R. was bonded with his grandparents and was doing very well in their care. She also stated that A.H. was very bonded with his grandmother and did not want to visit with D.R. if she was incarcerated. She agreed with the court-ordered plan for adoption since D.R. had not corrected her parenting deficiencies or addressed the concerns that brought the children into care. She did not recommend returning the children to D.R.'s care in the near future, stating that D.R. would need at least six to nine months after being released from incarceration to show that she could parent the children, complete the recommended services, and have adequate housing. She stated that this timeframe would delay permanence for the children and that attempts for reunification with D.R. might negatively impact the children if D.R. was not successful in correcting her parenting deficiencies. She believed that if the parent-child relationship continued and visitation resumed, it would disrupt the children's bond and connection with the grandparents. She further stated that if the children were re-introduced to D.R. and D.R. did not follow through with correcting her parenting deficiencies, the children would be hurt.

Following the testimony, the juvenile court found that the Department proved the elements in former RCW 13.34[.]180(1)(a) through (f) by clear, cogent, and convincing evidence. It found that there was little likelihood conditions would be remedied such that the children could return to D.R.'s care in the near future, as it was unclear when D.R. would be released from incarceration and she still needed to engage in numerous court ordered services and demonstrate compliance, progress, and stability outside of the [Department of Corrections]. As to former RCW 13.34.180(1)(f), the juvenile court found that the children were bonded with their grandparents, were integrated in their respective homes, and had stability. It also found that reintroducing the children to D.R., whom they had not seen in over a year, "would be confusing to the child[ren] and affect the bonding and disrupt the stability the child[ren have]." L.R. Clerk's Papers [at 78]. On March 5, 2013 the juvenile court entered orders terminating D.R.'s parental rights as to the children.

Ruling Affirming Orders Terminating Parental Rights at 2-8, *In re Welfare of L.R.*, No.

44595-6-II, at 2-8 (Wash. Ct. App. Oct. 15, 2013) (some alterations in original)

(footnotes omitted).

2.    RCW 13.34.180(1)(f) Analysis

We adopt verbatim the commissioner's analysis of the RCW 13.34.180(1)(f) issue:

D.R. argues that the Department failed to prove that continuation of the parent-child relationship diminished the children's prospects for integration into a stable and permanent home as required by former RCW 13.34.180(1)(f). She asserts that the evidence showed only a " 'subtle' " possibility that the children's relationship with the grandparents would change. Br. of Appellant at 16.

The juvenile court may order termination of a parent's rights as to his or her child if the Department establishes the six elements in former RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. The Department also must prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b). Clear, cogent and convincing evidence exists when the ultimate fact in issue is shown to be "highly probable." *In re the Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) [(internal quotation marks omitted)] (quoting *Supove v. Densmoor*, 225 Or. 365, 372, 358 P.2d 510 (1961)).

Because the trial court has the advantage of observing the witnesses, deference to the court is particularly important in termination proceedings. *In re the Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); *In re Dependency of K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). This court limits its analysis to whether substantial evidence supports the juvenile court's findings. *Sego*, 82 Wn.2d at 739. Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise. *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918

13

(1986), *cert. dismissed,* 479 U.S. 1050 (1987). This court does not review credibility determinations or weigh the evidence. *Sego,* 82 Wn.2d at 739-40.

The Department can prove former RCW 13.34.180(1)(f) in one of two ways: (1) that prospects for a permanent home exist, but the parent-child relationship prevents the child from obtaining that placement; or (2) that the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable home. *In re the Welfare of R.H.,* [176 Wn. App. 419, 428, 309 P.3d 620 (2013)]; *In re Dependency of A.C.,* 123 Wn. App. 244, 250, 98 P.3d 89 (2004); *In re Dependency of K.D.S.,* 176 Wn.2d 644, 659, 294 P.3d 695 (2013). Under the first method, "[RCW 13.34.180(1)(f)] is mainly concerned with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption it is especially a concern where children have potential adoption resources." *R.H.,* [176 Wn. App. at 428 (internal quotation marks omitted)] (quoting *A.C.,* 123 Wn. App. at 250 (emphasis in original)). Under the second method, the issue is whether continuation of the harmful parent-child relationship "diminishes the likelihood [the child] will be emotionally and psychologically prepared to integrate into a stable and permanent home should one become available." *R.H.,* [176 Wn. App. at 428 (internal quotation marks omitted)] (quoting *K.D.S.,* 176 Wn.2d at 659).

Substantial evidence supports the trial court's finding that continuation of the parent-child relationship clearly diminished the children's prospects for early integration into a stable and permanent home, as required under former RCW 13.34.180(1)(f). Here, both the social worker and the [guardian ad litem] testified that the children were doing well in their respective placements and were bonded to their grandparents. Jackson testified that the grandparents were willing to adopt the children if they became legally free. Given the children's prospects for a permanent home, continuing the parent-child relationship any longer clearly prevented them from obtaining a permanent and stable placement with their grandparents. Further, the evidence demonstrated that reestablishing a relationship with D.R. could negatively impact the children since they had not seen her in over a year. The [guardian ad litem] opined that reintroducing D.R. into the children's lives would affect their bond and stability with the grandparents, especially if D.R. did not follow through with services.

Ruling Affirming Orders Terminating Parental Rights at 2-8, *In re Welfare of L.R.,*

No. 44595-6-II, at 11-13 (some alterations in original).

No. 44595-6-II, consolidated with No. 44598-1-II

Based on the commissioner's analysis, we affirm the trial court's termination of D.R.'s parental rights.

MAXA, J.

We concur:

JOHANSON, A.C.J.

BJORGEN, J.