IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to: | ) | No. 35732-5-III |
| | ) | (consolidated w/ |
| S.A.J. | ) | No. 35733-3-III) |
| | ) | |
| | ) | |
| In the Matter of the Parental Rights to: | ) | UNPUBLISHED OPINION |
| | ) | |
| J.C.J. | ) | |

PENNELL, A.C.J. — Tabitha Stueckle appeals trial court orders terminating her parental rights to her minor children, J.C.J. and S.A.J. We affirm.

FACTS

Ms. Stueckle is the mother of J.C.J. (a son born in 2007) and S.A.J. (a daughter born in 2009). Ms. Stueckle was married to the children's father for several years. During the course of the marriage, Ms. Stueckle's husband subjected her to physical and emotional abuse. The abusive environment came to the attention of the Department of Social and Health Services in 2010.

Once the Department became involved, Ms. Stueckle tried escaping her husband's abuse by moving into a domestic violence shelter with her children. Unfortunately, this was not a lasting solution. Ms. Stueckle soon moved back in with her husband. She also

declined several services from the Department, although she eventually participated in a parenting and a domestic violence class.

In 2012, the Department received a referral alleging Ms. Stueckle had physically abused her son, J.C.J. Around that time, Ms. Stueckle had received diagnoses of depression, anxiety, and posttraumatic stress disorder (PTSD). She was engaged in voluntary counseling on a monthly basis that began in 2012 and continued to the time of trial.[1] A short time after the Department received the referral, Ms. Stueckle left her children with their father in Omak and moved to the Tri-Cities. Although Ms. Stueckle knew that leaving her children with their father placed them at risk, she felt unable to take them with her.

Once Ms. Stueckle was out of the family home, her husband filed for dissolution and he was designated primary custodian of the two children. Ms. Stueckle was given visitation rights, but was rarely able to exercise them. From the time Ms. Stueckle left the family home in 2012 until July 2014, she saw her children in person only three times.

---

[1] At trial, it was revealed that Ms. Stueckle may have been receiving counseling from an occupational therapist instead of a mental health therapist. However, Ms. Stueckle had stated that she was unwilling to participate in any further counseling. In addition, there was testimony that Ms. Stueckle's therapist at Lourdes Counseling Center in the Tri-Cities refused to release information to the Department.

Ms. Stueckle's move from Omak to the Tri-Cities enabled her to get on with her life. She found a new partner, who was not abusive. She also had two additional children.

Although Ms. Stueckle benefitted from leaving Omak, her two older children suffered. J.C.J. and S.A.J. were subjected to years of physical abuse by their father, his girlfriend, and other relatives. S.A.J. also suffered sexual abuse. By the time the Department learned of this ongoing abuse, both children exhibited significant behavioral challenges. Although J.C.J. was aged six and S.A.J. was aged four, the testimony at trial was that neither child had been toilet trained. Both children engaged in violent outbursts and S.A.J. acted out sexually. The Department placed both children in protective custody.

The Department filed a dependency petition for each of the children in April 2014. In July, the children's father agreed to a dependency order. He ultimately relinquished his parental rights.

Because the Department lacked her contact information, Ms. Stueckle's involvement in the dependency was somewhat delayed. An agreed dependency order as to Ms. Stueckle was finally entered in October 2014. Her parental deficiencies were identified as: failure to protect her children, poor supervision, and poor parenting skills. The court-ordered service plan required Ms. Stueckle to participate in and complete a

parenting course, a parenting assessment, a domestic violence evaluation, and to submit to random urinalysis (UA). Ms. Stueckle submitted all the requested UAs, each of which resulted in negative findings.

Ms. Stueckle's participation in services and visitation was hampered by a variety of personal circumstances. She lived several hours away from J.C.J. and S.A.J. She was dealing with a new family in the Tri-Cities. And, for the first several months of the dependency, she was busy responding to a criminal case in the Tri-Cities. Although the Department provided transportation assistance, Ms. Stueckle rarely found herself able to visit her two older children in person.[2] Most of Ms. Stueckle's visits with her children took place via Skype video conferencing.

When Ms. Stueckle had interactions with J.C.J. and S.A.J., she struggled to address their needs. Ms. Stueckle exhibited difficulty focusing on her children, she frequently dismissed or would one-up the children's statements, and her efforts to manage the children's behaviors were ineffective. Ms. Stueckle's children did not react well to her visits. During the time together, the children were emotionally withdrawn. After the visits, both children exhibited increased instances of acting out.

---

[2] In 2014, Ms. Stueckle attended 4 in-person visits with J.C.J. and S.A.J. In 2015 she attended at least 12 visits. But in 2016, Ms. Stueckle's visits were less frequent and she only attended 1 in-person visit prior to the termination trial in 2017.

The services that were provided to Ms. Stueckle had little impact on her parenting skills. Ms. Stueckle attended a parenting course during the summer of 2015, but did not demonstrate any observable improvement in her parenting methods. Ms. Stueckle also attended a women's empowerment group. Although Ms. Stueckle appeared comfortable in the group, she failed to demonstrate much change in her behavior.

Ms. Stueckle also declined services that might have helped her meet the needs of J.C.J. and S.A.J. Citing travel difficulties, she opted not to participate in therapeutic visits with her children. These visits could have helped Ms. Stueckle learn about and attend to her children's special needs. Ms. Stueckle also declined participation in a year-long domestic violence support program. Ms. Stueckle felt the group was inappropriate for her because she believed it was designed for perpetrators of abuse, not victims. The Department maintained the group was appropriate because Ms. Stueckle was no longer in an abusive relationship and the program was designed to build personal accountability for "both the abuser and the abused" in a "gender specific" format. Ex. 26 at 2.

During the course of the dependency, Ms. Stueckle participated in two parenting assessments. The second assessment, completed in April 2017, noted Ms. Stueckle demonstrated "extreme paranoia." Report of Proceedings (Aug. 10, 2017) at 118. The parenting assessment recommended a psychological / mental health evaluation to obtain

an accurate diagnosis. However, the Department never offered Ms. Stueckle such an evaluation or related services.

Ms. Stueckle was not provided court-ordered anger management services during the course of the dependency. According to the Department social worker, no services were available in Ms. Stueckle's area. However, the domestic violence support group that had been refused by Ms. Stueckle would have addressed anger management and conflict resolution skills. Ex. 26 at 2.

Although J.C.J. And S.A.J. were provided services throughout the dependency, they continued to exhibit behavioral problems. The younger child, S.A.J., was especially challenging. She exhibited over-sexualized behaviors, a lack of boundaries, and violent tendencies. S.A.J. received a diagnosis of PTSD and was considered a special needs child due to her aggressive sexual behaviors. S.A.J.'s therapist explained that she could not be left alone with other children because she would likely become a perpetrator of sexual abuse. The therapist also recommended S.A.J. not live in a home with other children.

J.C.J. was somewhat more stable than S.A.J., but his prognosis was still poor. J.C.J. was diagnosed with oppositional defiant disorder, PTSD, and reactive attachment disorder. J.C.J.'s therapist recommended J.C.J. reside in a group home setting. The

therapist also voiced concern that J.C.J.'s aggression and anger could pose a greater risk to others outside the close supervision provided in a group home.

During the termination trial in August 2017, Ms. Stueckle's social worker testified that Ms. Stueckle failed to make appreciable improvements in her parenting ability and she lacked much connection with J.C.J. and S.A.J. The social worker explained that Ms. Stueckle appeared not to understand the depth and nature of her children's problems.

The testimony at trial was also that J.C.J. and S.A.J. were in need of stability and, for them, the foreseeable future was somewhere between 60 days and six months. There was no testimony that Ms. Stueckle possessed the ability to meet her children's needs within that time frame. To the contrary, the testimony was that particularly given the two younger children in Ms. Stueckle's home, there was no foreseeable chance of returning J.C.J. and S.A.J. to Ms. Stueckle's care.

At the conclusion of trial, the court entered orders terminating Ms. Stueckle's parental rights to J.C.J. and S.A.J. The court found that all necessary services had been offered or provided and that there was little likelihood that Ms. Stueckle's parental deficiencies could be remedied so as to allow the return of J.C.J. and S.A.J. to her care in the near future. The court also found that termination of Ms. Stueckle's parental rights was in the best interests of the two children. Ms. Stueckle appeals.

7

ANALYSIS

Judicial termination of parental rights involves a two-step process. *In re Welfare of C.B.*, 134 Wn. App. 942, 951-52, 143 P.3d 846 (2006). The first step focuses on parental unfitness. *See In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). Under this first step, the Department must demonstrate parental unfitness by clear, cogent, and convincing evidence, including proof of the statutory factors set forth in RCW 13.34.180(1). RCW 13.34.190(1)(a)(i); *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 478, 379 P.3d 75 (2016). The second step focuses on the child and assesses whether it has been proved by a preponderance of the evidence that termination would be in the child's best interests. RCW 13.34.190(1)(b); *K.M.M.*, 186 Wn.2d at 479.

Our review of a trial court's termination decision is highly deferential. *K.M.M.*, 186 Wn.2d at 477. A trial court's factual findings will not be disturbed unless "'clear, cogent, and convincing evidence does not exist in the record.'" *Id.* (quoting *In re Dependency of K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995)).

*Parental unfitness*

With respect to the first part of the termination analysis, Ms. Stueckle makes two statutory claims. She contends the Department failed to provide necessary services, as required by RCW 13.34.180(1)(d). She also argues there was insufficient evidence that

8

continuation of the parent-child relationship would diminish J.C.J. and S.A.J.'s early integration into stable and permanent homes, as required by RCW 13.34.180(1)(f). We address each of the statutory claims in turn and ultimately disagree with Ms. Stueckle's contentions.

*Necessary services as required by RCW 13.34.180(1)(d)*

Ms. Stueckle claims the Department failed to provide the following necessary services: (1) domestic violence counseling, (2) services to help her understand her children's needs, (3) anger management counseling, and (4) a psychological evaluation.

With respect to the first three of the cited services, the blame for failed participation falls on Ms. Stueckle, not the Department. The Department offered Ms. Stueckle a long-term and comprehensive domestic violence support group, but Ms. Stueckle refused to participate in the program because she felt it was inappropriate. The Department also invited Ms. Stueckle to engage in therapeutic counseling with her children so that she could learn about their special needs. But again, Ms. Stueckle declined participation. With respect to anger management, the Department was unable to locate anger management counseling in Ms. Stueckle's geographic area, but anger and stress management was a component of the domestic violence support group rejected by Ms. Stueckle. Ex. 26 at 2.

9

Ms. Stueckle's refusal to take advantage of offered services excuses the

Department from offering services that might have provided additional assistance.

*K.M.M.*, 186 Wn.2d at 485 ("A parent's unwillingness or inability to make use of the

services provided excuses the State from offering extra services that might have been

helpful."); *In re Dependency of T.R.*, 108 Wn. App. 149, 163, 29 P.3d 1275 (2001)

("When a parent is unwilling or unable to make use of the services provided, [the

Department] is not required to offer still other services that might have been helpful.").

With respect to the issue of a psychological evaluation and counseling, Ms.

Stueckle claims she was not provided a court-ordered service. We disagree. Contrary to

Ms. Stueckle's representations, a psychological evaluation was never court-ordered. In

the "Findings" section of the January 19, 2017, dependency review orders, the trial court

noted that a psychological evaluation was "incomplete." Ex. 16 at 6-7; Ex. 38 at 6-7.

However, an evaluation was never actually ordered. No prior or subsequent court order

mentioned a psychological evaluation, mental health assessment, or related services.

Even the "Order" section of the January 19 review orders fails to direct Ms. Stueckle to

complete any such assessment or treatment. Ex. 16 at 11; Ex. 38 at 11.

The fact that a psychological evaluation was not court-ordered does not end our

analysis. Even when a service is not court-ordered, it may still be considered a necessary

10

service that the Department should have brought to the attention of the trial court prior to termination. RCW 13.34.180(1)(d); *In re Dependency of T.L.G.*, 126 Wn. App. 181, 200, 108 P.3d 156 (2005). Ms. Stueckle claims that a psychological evaluation and related services were necessary, even if not court-ordered, because those services were recommended as part of her April 2017 parenting assessment.

Ms. Stueckle's criticism of the Department's failure to offer a psychological evaluation and related services is unconvincing for two reasons. First, Ms. Stueckle did participate in voluntary mental health counseling throughout the dependency. The nature and extent of her participation is unclear, given the refusal of Ms. Stueckle and her treatment provider to provide a full release of information to the Department. Nevertheless, it is apparent that Ms. Stueckle was involved in mental health services and that she found the services helpful. Under the record presented at trial, it is unclear how additional psychological services would have made an appreciable difference. *See T.R.*, 108 Wn. App. at 162-63 (The Department does not fail to meet its burden when it is unclear how additional services could correct parental deficiencies.).

Second, and perhaps more importantly, the record establishes that additional services would not have helped Ms. Stueckle resolve her parental deficiencies in a timely manner. Under our case law, even when the Department inexcusably fails to offer

11

necessary services, termination is still appropriate if the services would not remedy the parent's deficiencies within the foreseeable future. *Id*. at 164. The point of view or perspective of the child dictates what the foreseeable future is. *K.M.M.*, 186 Wn.2d at 486.

Regardless of whether a psychological evaluation, mental health assessment or Department-mandated, as opposed to voluntary, mental health counseling could have helped Ms. Stueckle engage in Department-recommended services, there is no indication Ms. Stueckle would have become capable of parenting J.C.J. and S.A.J. Both children present significant behavioral challenges. In order to reunite with her children, Ms. Stueckle would need to demonstrate not just that she was a fit parent in the abstract, but that she would be able to meet the particular special needs of her two older children. *See id*. at 491-92. Parenting J.C.J. and S.A.J. would be difficult for most parents. There is no evidence indicating Ms. Stueckle is in a unique position of being up for the task.

In addition, the trial evidence shows that additional services would not help Ms. Stueckle meet her children's needs in a timely manner. According to the trial testimony, the foreseeable future as it relates to meeting the needs of J.C.J. and S.A.J. would be somewhere in the range of 60 days to six months. In order to meet the children's needs, Ms. Stueckle would need to make a turnaround in her therapy, such that

she would be open to accepting a full range of Department-recommended services. In addition, she would need to be able to find the time and ability to travel to see J.C.J. and S.A.J. so that she could learn more about their needs and how to provide a sufficiently structured home environment. Finally, Ms. Stueckle would need to resolve how she would be able to accommodate J.C.J. and S.A.J. in her household, even though the Department's witnesses testified that S.A.J. should not be left alone with other children and J.C.J. required the nearly constant supervision found in a group home setting. On the record at hand, it is unfortunately inconceivable that Ms. Stueckle would be able to overcome these barriers in time to meet the needs of her children.

*Early integration into permanent home—RCW 13.34.180(1)(f)*

Ms. Stueckle argues that continuation of her parental rights does not diminish her children's prospects for stability because J.C.J. and S.A.J. lack any prospects for a permanent home other than her residence.

Ms. Stueckle's position is contrary to controlling case law. Even when faced with a child that is difficult to place, the Department can meet its burden of proof under RCW 13.34.180(1)(f) by demonstrating that continuation of the parent-child relationship diminishes the likelihood that the child "will be emotionally and psychologically prepared

13

to integrate into a stable and permanent home should one become available." *In re*

*Dependency of K.D.S.*, 176 Wn.2d 644, 658-59, 294 P.3d 695 (2013).

Here, the record shows that the continuation of Ms. Stueckle's parental rights

would have destabilizing effects on J.C.J. and S.A.J. Neither child has an attachment to

Ms. Stueckle. After visits with Ms. Stueckle, both children have consistently exhibited

signs of emotional distress. Although it was not clear at trial what permanent placement

options would be available for J.C.J. and S.A.J., the trial court had ample evidence to

conclude that continuing Ms. Stueckle's parental rights to J.C.J. and S.A.J. diminished the

children's prospects for early integration into stable and permanent homes, as

contemplated by RCW 13.34.180(1)(f).

*Best interests of the child*

Similar to her arguments regarding RCW 13.34.180(1)(f), Ms. Stueckle contends

the Department failed to prove that terminating her parental rights to J.C.J. and S.A.J.

was in the children's best interests because the chances of adoption are low, there is no

advantage to terminating parental rights, and maintaining the relationship between

Ms. Stueckle and her children would not be detrimental to the children's well-being.

We disagree with Ms. Stueckle's contentions for the reasons previously explained.

J.C.J. and S.A.J. are in need of permanency. Although both children will be hard to

Nos. 35732-5-III; 35733-3-III
*In re Parental Rights to S.A.J.*

place, Ms. Stueckle's home is not a realistic option. It would take a significant amount of time for Ms. Stueckle to learn to parent J.C.J. and S.A.J. In addition, given the presence of two young children in Ms. Stueckle's home, it is doubtful that J.C.J. or S.A.J. would ever be able to live under the same roof as Ms. Stueckle. The trial court appropriately found that terminating Ms. Stueckle's parental rights to J.C.J. and S.A.J. was in the best interests of both children.

## CONCLUSION

The orders terminating Ms. Stueckle's parental rights to J.C.J. and S.A.J. are affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Pennell, A.C.J.

I CONCUR:

Korsmo, J.

15

Nos. 35732-5-III consolidated with 35733-3-III

FEARING, J. (dissenting) — Tabitha Stueckle's appeal of the termination of her parental rights to two children reveals institutional deficiencies in the Department of Social and Health Services' (DSHS) child welfare system. This case shows DSHS' failure to recognize the inability of a woman trapped in poverty to afford an attorney or navigate the legal system to protect herself and her children from an abusive marriage. DSHS may even blame Stueckle for the violence perpetrated on her by her former husband, the parent of her children. This appeal demonstrates DSHS' incapability to appreciate the obstacles to participating in services encountered by one who suffers from mental illness. In turn, DSHS does not diligently, patiently, and persistently labor to procure services when a parent faces such obstacles. And then DSHS posits slender excuses when failing to provide a parent necessary services to reunify with her children. This appeal illustrates DSHS' failure to comprehend that an adult who lived his or her childhood in foster care reasonably distrusts the government, resents instructions from DSHS, and rebuffs services demanded by DSHS. Finally, this case bares DSHS' erroneous belief that a child is always better served by years of residing in multiple foster homes rather than residing with his or her siblings and a neglectful natural parent. *See*

Nos. 35732-5-III cons. w/ 35733-3-III
*In re Parental Rights of S.A.J.* (Dissent)

Scott Greenstone, *Many Foster Kids Become Homeless*, SEATTLE TIMES, Feb. 28, 2019, https://www.seattletimes.com/seattle-news/homeless/many-homeless-people-are-former-foster-kids-this-program-could-break-that-cycle/; Lynn F. Beller, *When in Doubt, Take Them Out: Removal of Children from Victims of Domestic Violence Ten Years After* Nicholson v. Williams, 22 DUKE J. GENDER L. & POL'Y 205 (2015); Delilah Bruskas & Dale H. Tessin, *Adverse Childhood Experiences and Psychosocial Well-Being of Women Who Were in Foster Care as Children*, 17 PERMANENTE J. 131, 132 (2013); Theodore P. Cross, Eun Koh, Nancy Rolock & Jennifer Eblen-Manning, *Why Do Children Experience Multiple Placement Changes in Foster Care? Content Analysis on Reasons for Instability*, 7 J. PUB. CHILD WELFARE 1, 5-6 (2013); Frank C.P. van der Horst and René van der Veer, *Loneliness in Infancy: Harry Harlow, John Bowlby and Issues of Separation*, 42 INTEGRATIVE PSYCHOL. & BEHAV. SCI. 325 (2008); David M. Rubin et al., *The Impact of Placement Stability on Behavioral Well-Being for Children in Foster Care*, 119 PEDIATRICS 336 (2007); Douglas F. Goldsmith, David Oppenheim & Janine Wanlass, *Separation and Reunification: Using Attachment Theory and Research to Inform Decisions Affecting the Placements of Children in Foster Care*, 55 JUV. & FAM. CT. J., no. 2, 2004, at 1, 1-2; Sigrid James, *Why Do Foster Care Placements Disrupt? An Investigation of Reasons for Placement Change in Foster Care*, 78 SOC. SERV. REV. 601, 602 (2004); Dorothy E. Roberts, *Child Welfare and Civil Rights*, 2003 U. ILL. L. REV.

2

171, 176–77; Lawrence G. Albrecht, *Human Rights Paradigms for Remedying Governmental Child Abuse*, 40 WASHBURN L.J. 447, 448 (2001); Ana M. Novoa, *Count the Brown Faces: Where is the "Family" in the Family Law of Child Protective Services*, 1 SCHOLAR: ST. MARY'S L. REV. ON MINORITY ISSUES 5, 30 (1999); Jill Chaifetz, *Listening to Foster Children in Accordance with the Law: The Failure to Serve Children in State Care*, 25 N.Y.U. REV. L. & SOC. CHANGE 1, 15–17 (1999); Lawson G. Lowrey, *Personality Distortion and Early Institutional Care*, 10 AM. J. ORTHOPSYCHIATRY 576 (1940).

In addition to demonstrating the flaws in Washington's child welfare system, the termination of Stueckle's parental rights conflicts with Washington's statutory requirements. In particular, the termination excuses the State from failing to follow court orders and provide necessary services.

I dissent from the termination of Tabitha Stueckle's parental rights to Sheila and John for two reasons. First, the State failed to afford Stueckle ordered and necessary services. Second, the State failed to show that termination of the parent-child relationship will afford Stueckle's daughter and son permanency. I employ fictitious names, rather than initials, for Sheila and John because initials lend the opinion a disembodied tone as if the facts do not apply to real children.

Termination of parental rights is a two-step process. *In re Welfare of C.B.*, 134

3

Wn. App. 942, 952, 143 P.3d 846 (2006). First, the State must show that six statutory

requirements under RCW 13.34.180(1) are established by clear, cogent, and convincing

evidence. RCW 13.34.190(1)(a)(i). This means the State must show that the relevant

ultimate facts in issue are "highly probable." *In re Dependency of K.R.*, 128 Wn.2d 129,

141, 904 P.2d 1132 (1995); *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831

(1973). Second, the State must show a termination order serves the best interests of the

child. RCW 13.34.190(1)(b). The trial court must find by a preponderance of the

evidence that termination is in the best interests of the child. *In re Welfare of M.R.H.*,

145 Wn. App. 10, 24, 188 P.3d 510 (2008).

When the State seeks to terminate a parent's rights, it must show, in part, by clear,

cogent, and convincing evidence six factors:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order . . .
> (c) That the child has been removed . . . from the custody of the
> parent for a period of at least six months pursuant to a finding of
> dependency;
> (d) That the *services ordered* under RCW 13.34.136 have been
> expressly and understandably *offered or provided* and all *necessary
> services*, reasonably available, capable of correcting the parental
> deficiencies within the foreseeable future have been expressly and
> understandably *offered or provided*;
> (e) That there is little likelihood that conditions will be remedied so
> that the child can be returned to the parent in the near future. . . .
> (f) That continuation of the parent and child relationship clearly
> diminishes the child's prospects for early integration into a stable and
> permanent home.

4

RCW 13.34.180(1) (emphasis added). The State must independently prove each element in RCW 13.34.180(1) before a trial court may order the termination of parental rights under RCW 13.34.190(1)(a)(i). *In re Dependency of K.D.S.*, 176 Wn.2d 644, 656, 294 P.3d 695 (2013). This dissent focuses on subsections (d) and (f).

To meet its statutory burden under RCW 13.34.180(1)(d), the State must tailor the services it offers to meet each individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). The State must provide all court-ordered and necessary services to the parent. *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004). In addition to the services ordered by the court in the dependency order, the State must identify the necessary services in a permanency plan within sixty days of the child's removal from the home. RCW 13.34.136(1).

Contrary to the majority opinion, the trial court ordered a psychological evaluation. On pages 6 and 7 of the January 19, 2017, dependency review order, the trial court listed ordered services. The order read:

> [x] psychological evaluation, including recommendations per Court
> Report/Case Plan [ ] complied [ ] not complied [x] partial—incomplete

Ex. 16 at 6-7. The trial court placed the check mark inside the box next to psychological evaluation. The check mark was not a mistake because the court omitted placing a check mark in numerous other boxes. The trial court also weighed whether the parties had

5

complied with the order and found the provision of the service incomplete.

The majority notes that no other review order contained a direction for a psychological evaluation. Nevertheless, the majority fails to explain why the trial court would mark the January 19, 2017 order and also assess whether the service had been completed.

Whether or not the trial court ordered the mental health evaluation remains unimportant, however, because the undisputed facts show that the evaluation and mental health treatment were necessary to reunite Tabitha Stueckle with her children. The majority writes:

> The parenting assessment recommended a psychological and a mental health evaluation to obtain an accurate diagnosis. However, the Department never offered Ms. Stueckle a mental health evaluation or related services.

Majority at 5-6. This passage confirms the need for the mental health evaluation even assuming the trial court never ordered such an evaluation. Indeed, the parenting skills assessor, Tamara Tanninen, testified that she recommended a psychological evaluation and a mental health evaluation to start the process for change. At the conclusion of the parental rights termination trial, the trial court found that the parental assessment "recommended a Psychological/Mental Health Evaluation and [Stueckle] may need medical management." Clerk's Papers at 16.

6

The majority writes that Tabitha Stueckle was unwilling to participate in more counseling. Majority at 2 fn.1. The majority relies on the following testimony of Alicia Tonasket, the last social worker assigned to the case by DSHS:

> Q But you testified earlier that you did not refer her for counseling?
> A No, because of her attestation that she is already doing counseling and not willing to do additional counseling.
> Q Now that you know that it was part of the court order beginning in January of 2016, would you have pressed further for releases from her counselor that she reported to you?
> A I would have.
> Q After finding out that this person [providing Tabitha counseling] was an occupational therapist rather than a mental health therapist, why didn't you refer to other counseling?
> A It must have been oversight.

Report of Proceedings (RP) at 418-19. Even assuming no court order for an evaluation, Tonasket should have known of the parenting assessment that recommended a mental health evaluation and related services. In short, DSHS failed to refer Stueckle for a mental health evaluation. The lack of an evaluation precluded needed mental health counseling.

Tabitha Stueckle never testified that she would refuse mental health counseling from another service provider. The trial court entered no finding of fact that Stueckle would refuse counseling from a mental health counselor as opposed to an occupational therapist.

The majority writes that Tabitha Stueckle's therapist and Stueckle refused to

7

release information to DSHS. Majority at 2 fn.1. The undisputed evidence, however, established that only the therapist refused to share information. Stueckle signed a release for her counselor to divulge the records to DSHS, but the counselor chose otherwise in order not to breach the counselor-patient privilege. Many counselors balk at disclosing records to third parties because the disclosure of the records impairs the counselor-patient relationship.

DSHS faults Tabitha Stueckle for failing to regularly visit Sheila and John. In turn, the majority writes that DSHS provided transportation assistance for Tabitha Stueckle to visit Sheila and John. The assistance was wanting, however. Sheila and John generally resided in Okanogan County, although John lived for a year in Spokane. The traveling distance between Okanogan County and Richland, Tabitha Stueckle's home, exceeds three hours. Tabitha Stueckle and Farel Hettinger live in poverty and attempt to raise two other children. Stueckle rarely had access to a vehicle. The State gave Tabitha Stueckle $400 to purchase a car. $400 does not purchase a reliable car.

DSHS transported Sheila and John to Richland for a parenting assessment. Nevertheless, the State failed to transport the children on other occasions to Richland for visitation. Social worker Alicia Tonasket excused her failure to provide transportation to Richland by declaring a "belief" that DSHS had no driver willing to make the trip between Okanogan County and Richland. Also, according to Tonasket, no visitation

8

agency would direct an employee to make the roundtrip. Perhaps DSHS could employ a driver willing to fulfill DSHS' obligations.

Alicia Tonasket further lamented that John once urinated in a car, which might preclude an adult from permitting him inside the car. One would hope that DSHS would be able to navigate the problem of a child who wets his or her pants while traveling. The excuse also suggests DSHS lacks knowledge of diapers or, if an older child refuses diapers, other precautions that might be taken to prevent spoiling of a car if a child urinates therein. Tonasket's lament suggests that DSHS refuses to arrange transportation for infants, all of whom randomly and suddenly urinate.

During the time that John lived in Spokane and Sheila lived in Omak, DSHS transported Sheila every other weekend to Spokane to visit John. If DSHS provided transportation for one child from Okanogan County to Spokane, the agency should be able to provide transportation to John and Sheila to Richland when the two children both resided in Okanogan County.

The State also never explained why the children could not be transferred to a foster home in the Tri-Cities to facilitate in-person visitation with Tabitha Stueckle. The father probably continued to reside in Okanogan County, but his visitations were sporadic and he eventually relinquished parental rights in the children.

The majority writes that Tabitha Stueckle opted not to participate in therapeutic

9

services with her children because of transportation difficulties. I do not know if the majority belittles Stueckle for a lack of transportation resulting from her poverty. According to DSHS, Dr. Terri Greer was to conduct the therapeutic visits. The majority omits that Stueckle called Dr. Greer to participate in visits, and Greer did not permit Stueckle to attend counseling with the children.

DSHS faults Tabitha Stueckle for failing to participate in a domestic violence group class. In turn, the majority writes that DSHS deemed the offered domestic violence class appropriate because the class was designed to build personal accountability for "both the abuser and the abused." Majority at 5, quoting in part Exhibit 26 at 2. This passage suggests that Stueckle should hold herself accountable for domestic violence meted on her by her first husband and the domestic violence program offered by DSHS would teach her to blame herself.

DSHS referred Tabitha Stueckle to Stan Woody's Healthy Relationship program. Woody, contrary to DSHS' insistence on Stueckle participating in a domestic violence educational program, did not characterize his program as a domestic violence program. More importantly, Woody opened the group to both perpetrators and victims of domestic violence and, in his mind, did not distinguish the two. Instead, Woody remarkably believes that 98 percent of domestic violence victims are also perpetrators. A questioning person might sympathize with Stueckle's refusal to participate in such a program.

10

Stueckle did not wish to take a domestic violence class with perpetrators. Stueckle fled from her abuser at the expense of leaving her children, and she did not have access to the children for years because of her poverty and threats from the abuser. Despite her objections to Woody's program, the DSHS social worker failed to look for an alternative course for Stueckle to attend.

DSHS contends that Tabitha Stueckle could not, if provided a mental health evaluation and mental health treatment, remedy her parental deficiencies within six months, the foreseeable future for the children. This argument fails to recognize that DSHS should have delivered the evaluation, counseling, and treatment years earlier.

DSHS also contends that the record does not show how additional psychological services would help. This statement fails to note the purpose of the mental health counseling proposed by the parenting assessment. Because of her background, Tabitha Stueckle possessed a mental block that prevented her from understanding Sheila and John's needs and even her own needs to engage in parenting services and classes. The counseling would allow Stueckle to overcome this mental block. Strong and effective mental health counseling could have changed Stueckle's attitude such that she would participate in and benefit from other services. Parenting skills assessor Tamara Tanninen opined that Stueckle holds the capacity to change.

The majority holds that any ordered services not provided by DSHS would be

11

futile. In so ruling, the majority assumes the role of a factfinder. The trial court never found that a mental health evaluation or mental health counseling recommended by the evaluation would be futile.

The State not only failed to provide ordered or necessary services, but failed to prove the final element of a parental rights termination case. Under RCW 13.34.180(1)(f), the State must show with clear, cogent, and convincing evidence that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. DSHS presented no evidence that termination of the parent-child relationship would facilitate Sheila and John's early integration into stable and permanent homes. To the contrary, all the evidence showed the children had moved often from home to home and that this phenomenon would continue into the future because of the needs of the children.

The majority correctly cites the proposition, from *In re Dependency of K.D.S.*, 176 Wn.2d at 658 (2013), that the State need not prove that a stable and permanent home is available at the time of the termination. Still, DSHS must show the continued parent-child relationship diminishes the child's prospects of integration into a stable and permanent home. *In re Dependency of K.D.S.*, 176 Wn.2d at 658.

In *In re Dependency of K.D.S.*, the child benefitted from continuous caregivers who could meet her special needs. The State presented testimony that more than one

12

couple and her teacher expressed interest in adopting K.D.S.

DSHS presented no evidence of any person being willing, let alone able, to parent Sheila and John. To the contrary, social worker Alicia Tonasket testified to the difficulty in finding foster homes for the children because of their needs. Foster parents found Sheila and John unmanageable. At the time of trial, Sheila resided in her fifth foster home. John spends much of his time in various behavioral rehabilitation services homes, which homes do not adopt. According to guardian ad litem Tara Serles, Sheila also needs placement in a behavioral rehabilitation services home.

_____
Fearing, J.

13