[No. 86124-2. En Banc.]

Argued June 12, 2012.     Decided February 14, 2013.

*In the Matter of the Dependency of* K.D.S.

DEREK GLADIN, *Petitioner*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Jennifer L. Dobson*; and *Dana M. Nelson* (of *Nielsen, Broman & Koch PLLC*), for petitioner.

*Robert W. Ferguson, Attorney General, Sarah J. Reyes, Section Chief, Assistant Attorney General, Anne E. Egeler, Deputy Solicitor General,* and *Melissa L. Nelson, Assistant Attorney General,* for respondent.

¶1 FAIRHURST, J. — This case requires us to clarify what the State must prove when seeking to terminate parental rights. The Court of Appeals has interpreted language from our decision in *In re Dependency of J.C.*, 130 Wn.2d 418, 924 P.2d 21 (1996), to mean that when the State presents evidence sufficient to prove the element codified in RCW 13.34.180(1)(e), it has necessarily proved the element codified in RCW 13.34.180(1)(f). Consequently, the Court of Appeals affirmed the termination of the parental rights of

K.D.S.'s father, Derek Gladin, because the State proved RCW 13.34.180(1)(e). We disagree with this interpretation and reverse the Court of Appeals' decision to affirm on these grounds. However, because the trial court properly found that the State had proved each element, we affirm the decision to terminate Gladin's parental rights.

## I. FACTUAL AND PROCEDURAL HISTORY

¶2 The State first sought an order of dependency for K.D.S. nearly a decade ago. The State established dependency for K.D.S. as to Gladin in 2003 due to neglect.[1]

¶3 K.D.S. is now a 17-year-old girl whose neuro-behavioral disorders cause her to exhibit extremes in behavior. Her diagnoses include fetal alcohol exposure, attention deficit hyperactivity disorder, posttraumatic stress disorder, communication disorder, attachment disorder, mild mental retardation, oppositional defiance disorder, pervasive developmental disorder, and a mood disorder. Her caretakers have described K.D.S. as angelic and sweet when "things are going well." Verbatim Report of Proceedings (VRP) (Apr. 15, 2010) at 360. During these times she is quite charming and loving. However, her disorders cause K.D.S. to act out aggressively when stressed or frustrated. Her physical outbursts include biting, kicking, and hitting; her caretakers have suffered scratches, bites, bloody noses, fat lips, and kicks to the head from K.D.S. She also injures herself, or attempts to injure herself, during her episodes. The record contains allegations that K.D.S. suffered sexual abuse either at the hands of her father or by companions of her mother. This abuse has caused K.D.S. to react to stress in a sexually inappropriate manner.

¶4 Because of her behavioral difficulties, K.D.S. requires care around the clock. She currently lives in an institutional home without roommates. This provides her with the one-

---

[1] The State earlier had established dependency for K.D.S. as to her mother due to abuse and neglect.

on-one care she needs. Her caretakers have put special measures in place to deal with K.D.S.'s behavioral issues and have, on occasion, called police to help restrain her. Her school has similarly implemented special procedures to deal with K.D.S.'s outbursts. Collectively, her caretakers have created an integrated structure for K.D.S.'s days. These arrangements have provided K.D.S. with the stability and structure she needs to progress socially and academically. K.D.S.'s outbursts have dropped dramatically due to these provisions for her care.

¶5 After receiving clearance to explore adoption for K.D.S., the State petitioned to terminate the parental rights in 2009. Gladin contested the termination and the trial court heard four days of testimony.[2]

¶6 Gladin and the State offered starkly contrasting pictures of the effects of Gladin's relationship with K.D.S. at the termination trial. Gladin introduced evidence that K.D.S. always seemed happy to see him. He also sought to show he provided positive parenting. This included engaging in activities with K.D.S. and redirecting her away from issues causing her behavior to escalate out of control.

¶7 In response, the State sought to show Gladin's relationship with his daughter harmed K.D.S. The psychiatrist who evaluated Gladin as part of the dependency proceeding opined that Gladin's personality prevented him from understanding the impact of his behavior on his daughter. Another witness repeatedly testified that Gladin demonstrated an inability to understand K.D.S.'s needs. K.D.S.'s social worker testified that Gladin's inability to understand his daughter's needs placed her at risk of injury due to her limited communication skills and ability to interact with others.

¶8 K.D.S.'s caretakers testified that her emotional well-being required consistency and structure. They explained that Gladin could not, and did not, provide this structure

---

[2] Because the mother did not contest the State's petition and did not appear to defend her rights, the trial court terminated her parental rights prior to hearing testimony about terminating Gladin's rights.

and consistency. Gladin showed up late to visits or missed them altogether. His inconsistency in his visits required K.D.S.'s caretakers to stop telling her about Gladin's upcoming visits. The caretakers felt compelled to do so because his failure to be punctual, or appear at all, caused K.D.S. to act out.

¶9 The State's witnesses testified that Gladin's interactions with his daughter greatly distressed her. Witnesses noted that Gladin became confrontational with the staff caring for K.D.S. during his visits. K.D.S. found these quarrels "very upsetting." VRP (Apr. 13, 2010) at 99. The trial court heard numerous times that K.D.S.'s negative behavior escalated after Gladin visited. This included her attempt to jump out of a second story window just after a visit from Gladin. K.D.S.'s care coordinator testified that she became so concerned about these escalations that she obtained a court order to suspend Gladin's visits until he could meet with K.D.S.'s caretakers and discuss how to visit in a way that would minimize K.D.S.'s distress. Gladin missed the first meeting devoted to this subject; he arrived so late for the second meeting that the caretakers had gone home. He never attempted to reschedule this final meeting and, therefore, has not seen K.D.S. since 2008.

¶10 The trial court also heard testimony about the effect of Gladin's parental rights on K.D.S.'s adoptability. Her social worker testified that the State would have a difficult time placing K.D.S. for adoption. However, her social worker testified that K.D.S. did have some prospects for adoption; she testified that adoption was more likely than K.D.S. ever returning to her father's care. The social worker pointed to specific instances where people had expressed interest in adopting K.D.S. These instances included a family in Idaho and one of her teachers in Spokane. K.D.S.'s social worker also stated that termination of Gladin's parental rights would increase the chances of K.D.S. achieving placement in an adoptive home.

¶11 During closing arguments, the State urged the trial court to find that if no prospects existed for an imminent

reunion between Gladin and K.D.S., it should necessarily find that Gladin's continuing relationship with K.D.S. diminished her prospects for integration into a stable and permanent home. The State argued that if it had satisfied its burden of proving RCW 13.34.180(1)(e), it necessarily had proved RCW 13.34.180(1)(f). When the State made this argument, the trial court correctly noted that accepting the State's position rendered one of the elements the State had to prove irrelevant. Later, when giving its oral ruling, the trial court explicitly rejected the argument that the State's satisfaction of its burden of proof for RCW 13.34.180(1)(e) necessarily satisfied its burden to prove RCW 13.34-.180(1)(f). The trial court then found that the State had clearly proved the first five elements. On the subject of the sixth element, the trial court stated:

> I get to the sixth one and that is continuation of the parent-child relationship clearly diminishes [K.D.S.'s] prospects for early integration . . . . But that prong means something besides the first five. If after the first five were found the sixth was ipso facto, as the Department argues here, then we wouldn't even have that. We would only find the first five and say terminate.

VRP (Apr. 19, 2010) at 541.

¶12 The trial court's finding of fact 2.14 reflected its determination that Gladin's relationship with K.D.S. diminished her chances for integration into a stable and permanent home:

> [K.D.S.] is not currently in an adoptive home. Terminating Mr. Gladin's parental rights would increase [K.D.S.'s] chances for finding a permanent home, and would allow the Department to have more adoptive options available. More families are willing to adopt when a child is legally free. Although the chances of finding a stable and permanent home for [K.D.S.] are small, continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. The continuation of the status quo is not in the child's best interests and a resolution is needed as

to who will be this child's permanent caretaker. The child's needs for permanence and stability must, at this point in time, be accorded priority over the rights of the biological parents in order to foster the early integration of the child into a stable and permanent home as quickly as possible.

Clerk's Papers at 8. Based on its findings, the trial court terminated Gladin's parental rights.

¶13 Gladin appealed. He argued, among other things, that the State had not sufficiently proved that the continuation of his relationship with K.D.S. clearly diminished her prospects for integration into a stable and permanent home. The Court of Appeals commissioner rejected all of Gladin's challenges. The commissioner affirmed the trial court's rulings regarding the sufficiency of the State's proof of the element found in RCW 13.34.180(1)(f) based on the Court of Appeals' decision in *In re Dependency of P.P.T.*, 155 Wn. App. 257, 229 P.3d 818 (2010). In *P.P.T.*, the court held that proof of the element codified in RCW 13.34.180(1)(e) necessarily proved the element codified in RCW 13.34.180(1)(f). A panel of the Court of Appeals rejected Gladin's motion to modify the commissioner's order. Gladin sought, and we granted, discretionary review to decide whether the Court of Appeals has properly construed RCW 13.34.180(1) and whether the State had sufficiently proved all the elements codified therein. We affirm the trial court's decision, although on different grounds.

## II. ISSUES PRESENTED

¶14 A. Does successful proof of the element codified in RCW 13.34.180(1)(e) always mean successful proof of the element codified in RCW 13.34.180(1)(f)?

¶15 B. Did the State prove that the continuation of Gladin's relationship with K.D.S. clearly diminished K.D.S.'s prospects for early integration into a stable and permanent home by clear, cogent, and convincing evidence?

## III. STANDARD OF REVIEW

■ ¶16 The first issue involves questions of statutory interpretation, which we review de novo. *Jackowski v. Borchelt*, 174 Wn.2d 720, 729, 278 P.3d 1100 (2012). The second issue involves the sufficiency of the evidence. We will uphold the trial court's findings if they are supported by substantial evidence. *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

## IV. ANALYSIS

■ ¶17 Parents have a fundamental liberty interest in the custody and care of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011). The legislature has prescribed a statutory scheme that balances the parents' liberty interest with the child's right to a safe and healthy environment. *In re Welfare of A.B.*, 168 Wn.2d 908, 919, 232 P.3d 1104 (2010). According to this legislative design, codified in part as RCW 13.34.180(1)(a)-(f), the State must prove six statutory elements by clear, cogent, and convincing evidence before terminating parental rights. RCW 13.34.190(1)(a)(i).[3] *In re*

---

[3] RCW 13.34.180(1) requires the State to prove:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future[: and]

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

*Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999); RCW 13.34.180(1). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.' " *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Gladin argues that the Court of Appeals improperly conflated this legislative scheme and that this allowed the State to terminate his parental rights based on an insufficient showing.

A. Proof of RCW 13.34.180(1)(f) does not necessarily follow from proof of RCW 13.34.180(1)(e)

¶18 Gladin maintains that the Court of Appeals erred by interpreting language from our decision in *J.C.* to mean that proof of RCW 13.34.180(1)(e) necessarily proves RCW 13.34.180(1)(f). *P.P.T.*, 155 Wn. App. at 269-70. Gladin argues that our decision in *K.S.C.* limited the application of the language at issue in *J.C.* to the facts of that case. Gladin also asserts that accepting the Court of Appeals' interpretation renders RCW 13.34.180(1)(f) superfluous. We agree with Gladin's contentions.

¶19 In *J.C.*, we affirmed the termination of the mother's parental rights. 130 Wn.2d at 429. During the termination trial, the State had introduced evidence showing the mother, K.C., could not provide a safe, stable environment for her children and that she had a dysfunctional relationship with them. *Id.* at 428-29. The State's witnesses had testified that the mother failed to properly follow programs intended to deal with her drug and alcohol abuse, failed to participate in classes offered to help her develop parenting skills, and failed to participate fully in family counseling sessions. *Id.* at 422. When the mother did participate in counseling, she often brought her abusive boyfriend with her despite the wishes of the counselor. *Id.* at 423. She also informed her children during supervised visits that if they did not behave she would " 'go out and get drunk or go out

and get high.' " *Id.* at 422 (quoting Report of Proceedings at 79). After visits with the mother, the children were " 'very upset.' " *Id.* The trial court terminated the mother's parental rights. *Id.* at 423-24. The mother appealed this decision, arguing that the State had failed to prove the elements now codified in RCW 13.34.180(1)(d)-(f).[4] *Id.* at 424. The Court of Appeals reversed the trial court's decision to terminate the mother's parental rights. *Id.* at 424-25.

¶20 We reversed the Court of Appeals, reinstating the order terminating the mother's parental rights. We discussed the contested elements and stated:

> Our focus is on [former] RCW 13.34.180(5) [(1993)] because we are satisfied that substantial evidence in the record supports the juvenile court's finding that "services ordered under [former] RCW 13.34.130 [(1995])[5] have been offered or provided." [Former] RCW 13.34.180(4). Indeed, although K.C. assigned error to the juvenile court's findings in this regard, she has not advanced any argument in her brief to this court or to the Court of Appeals relevant to that assignment of error. Insofar as the finding required by [former] RCW 13.34.180(6), that continuation of the parent-child relationship diminishes the child's prospects for early integration into a stable and permanent home, such a finding necessarily follows from an adequate showing of the allegation made in [former] RCW 13.34.180(5).

*J.C.*, 130 Wn.2d at 426-27. The Court of Appeals has understood this last sentence to stand for the proposition that whenever the State proves RCW 13.34.180(1)(e) by clear, cogent, and convincing evidence, it has necessarily and similarly proved RCW 13.34.180(1)(f). *P.P.T.*, 155 Wn. App. at 269.

¶21 Contrary to the Court of Appeals' interpretation of this language, our cases have shown that the State must

---

[4] At the time we decided *J.C.*, these elements were codified as RCW 13.34-.180(4)-(6). The legislature recodified them as RCW 13.34.180(1)(d)-(f) in 2000. LAWS OF 2000, ch. 122, § 25.

[5] This statutory provision now references RCW 13.34.136. LAWS OF 2000, ch. 122, §§ 18, 25.

prove each element of RCW 13.34.180(1) before a trial court may terminate parental rights under RCW 13.34.190(1)(a)(i). *K.S.C.*, decided three years after *J.C.*, demonstrates this principle. In *K.S.C.* we affirmed the decision to terminate the parental rights of K.S.C.'s mother. 137 Wn.2d at 921. The mother had challenged whether the State had proved that continuation of the parent-child relationship diminished K.S.C.'s prospects for integration into a stable and permanent home under RCW 13.34.180(1)(f). *K.S.C.*, 137 Wn.2d at 926. She did not properly raise a challenge under RCW 13.34.180(1)(e). *K.S.C.*, 137 Wn.2d at 926 n.3. So although RCW 13.34.180(1)(e) was satisfied, we nonetheless analyzed whether the State had proved the allegation codified in RCW 13.34.180(1)(f). *K.S.C.*, 137 Wn.2d at 928. If a finding under RCW 13.34.180(1)(f) necessarily followed from a finding under RCW 13.34.180(1)(e), we would not have needed to review this issue. This approach of reviewing a challenge to RCW 13.34.180(1)(f), despite the State's having met its burden under RCW 13.34.180(1)(e), fits with both our pre- and post-*J.C.* cases. *See, e.g.*, *In re Esgate*, 99 Wn.2d 210, 660 P.2d 758 (1983) (analyzing whether the State had met its burden under former RCW 13.34.180(6) despite a finding that it had met its burden under former RCW 13.34.180(5)); *A.B.*, 168 Wn.2d at 911 (the State must prove "each" of the six termination factors "clearly, cogently, and convincingly").

¶22 Facts supporting a conclusion under RCW 13.34-.180(1)(e) may, but do not necessarily, also support a conclusion under RCW 13.34.180(1)(f). In *J.C.*, for example, the fact that the mother was unlikely to change behaviors that had psychologically destabilizing effects on her children also supported a determination that continuation of their relationship clearly diminished the likelihood that the children would be emotionally and psychologically prepared to integrate into a stable and permanent home if and when one became available. Indeed, this would explain our con-

clusion in *J.C.* that an adequate showing of the allegation made pursuant to former RCW 13.34.180(5) led to a necessary finding of the allegation under former RCW 13.34-.180(6). But the existence of overlapping facts does not relieve the State of its burden of proving RCW 13.34-.180(1)(f) independently of RCW 13.34.180(1)(e). And where facts do not overlap, little reason exists to tie a finding under RCW 13.34.180(1)(f) to a finding under RCW 13.34.180(1)(e).

¶23 Furthermore, as Gladin argues, treating the two factors individually also comports with the rules of statutory construction. "[I]t is a fundamental principle of statutory construction that courts must not construe statutes so as to nullify, void or render meaningless or superfluous any section or words" of the statute. *Taylor v. City of Redmond*, 89 Wn.2d 315, 319, 571 P.2d 1388 (1977). Accepting the Court of Appeals' interpretation of *J.C.* renders RCW 13.34-.180(1)(f) superfluous because, under its view, no showing needs to be made to prove RCW 13.34.180(1)(f) as long as RCW 13.34.180(1)(e) is proved.

¶24 We hold that the State must independently prove each element in RCW 13.34.180(1) before a trial court may order the termination of parental rights under RCW 13.34-.190(1)(a)(i). Proof of the element codified in RCW 13.34-.180(1)(e) does not necessarily prove the element codified in RCW 13.34.180(1)(f). Evidence may support more than one element found within RCW 13.34.180(1). However, to terminate parental rights, the trial court must find that the State has proved each of these elements.

B.   The State presented evidence proving that Gladin's relationship with K.D.S. diminished her chances for placement in a stable and permanent home

¶25 Although the Court of Appeals misstated the law, it is unnecessary to reverse because the trial court found the State had proved, by clear, cogent, and convincing evidence each element of RCW 13.34.180(1). We hold substantial

evidence supports its decision and affirm the termination of Gladin's parental rights.

¶26 The record shows that the trial court specifically rejected the very interpretation of RCW 13.34.180(1) that Gladin appeals. The trial court expressed skepticism when the State, during closing arguments, contended that proof of RCW 13.34.180(1)(e) proves RCW 13.34.180(1)(f). The trial court, when making its oral ruling, stated that the sixth element had to mean "something besides the first five." VRP (Apr. 19, 2010) at 541. The trial court rejected the State's argument and proceeded to make finding of fact 2.14, which found that Gladin's relationship with his daughter diminished her chances of integration into a stable and permanent home.

¶27 Gladin argues that K.D.S.'s issues prevent her from ever achieving placement in a stable and permanent home. Gladin suggests K.D.S. is not a "candidate for relative placement or a guardianship." Suppl. Br. of Pet'r at 15. He claims the trial court's declaration that " '[K.D.S.] is in as . . . stable and permanent home now as she'll ever be in' " supports his contention that K.D.S. has no general or specific prospects for adoption. Suppl. Br. of Pet'r at 15 (first alteration in original) (quoting VRP (Apr. 19, 2010) at 543). In essence, he argues that his relationship with her cannot diminish her chances of integration into a stable and permanent home because she has no prospects for placement in such a home.

¶28 Gladin attempts to revive an argument we have already rejected. We have noted that RCW 13.34.180(1)(f) makes no reference whatsoever to the type of stable home required in order to terminate parental rights. For example, in *Esgate* the appellant argued, just as Gladin does here, that the trial court improperly terminated his rights because his child had no prospects for adoption. 99 Wn.2d at 214. We rejected this claim, noting that "[h]ad the Legislature intended termination only in those cases where the child would be adopted, it could have so provided by

substituting [adoptive home] for the words 'stable and permanent home'." *Id.* (quoting former RCW 13.34.180(6)). The same logic applies to Gladin's contentions about guardianship or foster care placement. We have repeatedly stated that RCW 13.34.180(1)(f) focuses on "the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. The State does not have to prove that a stable and permanent home is available at the time of termination." *K.S.C.*, 137 Wn.2d at 927. The plain language of RCW 13.34.180(1)(f) merely requires the trial court to find that the continued parent-child relationship diminishes the child's prospects of *integration* into a stable and permanent home. *See K.S.C.*, 137 Wn.2d at 927.

¶29 Where the petitioner has argued that their child has no prospect for placement in a stable and permanent home, other evidence regarding the quality of the parent-child relationship has often been found to satisfy the State's burden of proof for RCW 13.34.180(1)(f). In *Esgate*, for example, we terminated parental rights over a severely mentally and emotionally disabled child, despite the fact that it was unlikely that the child would ever be adopted. 99 Wn.2d at 214. We focused on the overarching goal of protecting the best interests of the child and terminated parental rights because continuation of the parent-child relationship created feelings of insecurity and instability in the child. *Id.*

■ ¶30 The record contains sufficient evidence to support the finding that the continued parent-child relationship harms K.D.S.'s well-being. Gladin cannot grasp K.D.S.'s needs and limitations. Nor can he understand the impacts of his behavior on her health. The trial court heard testimony that these aspects of Gladin's personality put K.D.S.'s physical safety at risk. K.D.S.'s inability to communicate or interact with other people, combined with her temper, requires attention to, and understanding of, her needs to prevent her from harming herself. Further, K.D.S.

requires consistency and structure to maintain her emotional well-being. Her caretakers have created a regime that provides these for her; K.D.S.'s outbursts have declined precipitously due to the structure and care she currently receives. Gladin's quarrels and inability to work with K.D.S.'s caretakers and his inability to provide consistency for her, shown most strongly by his inability to show up on time, or not at all, for visits with her, undermine this structure and consistency. The trial court repeatedly heard testimony that Gladin's visits caused destabilization in K.D.S.'s life. These destabilizations led to behavioral outbursts that included biting, kicking, punching, and on one occasion, an attempt by K.D.S. to throw herself out of a second story window. Just as in *J.C.*, the continuing parental relationship diminishes the likelihood K.D.S. will be emotionally and psychologically prepared to integrate into a stable and permanent home should one become available.

## V. CONCLUSION

¶31 The legislature set forth six elements the State must prove before obtaining a court order to terminate parental rights under RCW 13.34.190(1)(a)(i). We affirm today that the State must prove each of those elements by clear, cogent, and convincing evidence. We affirm on other grounds the Court of Appeals' decision to terminate Gladin's parental rights because the trial court required the State to prove all six elements before ordering the termination of Gladin's parental rights and because substantial evidence in the record supports the trial court's decision.

MADSEN, C.J.; OWENS, WIGGINS, and GONZÁLEZ, JJ.; and CHAMBERS, J. PRO TEM., concur.

¶32 C. JOHNSON, J. (dissenting) — Terminating parental rights is a drastic remedy. While in this type of case the parent will likely never be able to provide his or her child

with the needed care, few people have the skills or means necessary to adequately care for a child with such severe disabilities. This deficiency should not be a deciding factor in whether parental rights are terminated.

¶33 Moreover, RCW 13.34.180(1)(f) is about stability for the child. Courts have applied subsection (1)(f) in two contexts, neither of which applies here. The first is where the parent provides a destabilizing influence in the child's life. This occurred in *J.C.* where the mother told her children to behave or she would go out and get high. *In re Dependency of J.C.*, 130 Wn.2d 418, 924 P.2d 21 (1996). The second is where there is a possibility that the child will be adopted. This was the case in *A.V.D.* where the grandmother said she would adopt only if the parents' rights were terminated. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 815 P.2d 277 (1991).

¶34 In this case, as the trial court recognized, the likelihood that K.D.S. will be adopted is nonexistent. While the majority correctly points out that the State need not prove a stable and permanent home already exists, some evidence supporting a reasonable level of possibility must be shown. If not, subsection (1)(f) will be too easily presumed in other similar cases because adoption is always more likely once parental rights have been terminated. If subsection (1)(f) is too easily met, it becomes just a meaningless factor.

¶35 Perhaps recognizing this weakness, the majority delves into the record in search of evidence that Derek Gladin's continued relationship with K.D.S. harms her well-being. However, appellate courts should be hesitant to upset the trial court's important credibility and factual determinations, which it alone is uniquely qualified to make. This is especially true in termination proceedings where the legislature, recognizing the important constitutional issues at play, requires the State to meet a high burden of proof to terminate parental rights. Here, rather than finding the relationship harmed K.D.S., the trial court stated, "I don't see any harm to [K.D.S.] with supervised

visits" and would have preferred, if it had the authority, to maintain Gladin's parental rights until a likely adoptive home surfaced. Verbatim Report of Proceedings (Apr. 19, 2010) at 543. The majority upsets the trial court's clear determinations.

¶36 In the end, K.D.S. will likely remain in a group home for the rest of her life. The faces in this group home will come and go. The only long-term and stable relationship in her life would have been with her father, who desires to retain a parental role in her life. Today's ruling too easily takes that relationship away.

¶37 The order of termination should be reversed.

J.M. JOHNSON and STEPHENS, JJ., concur with C. JOHNSON, J.

Reconsideration denied April 4, 2013.