IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of L.A.T-J., dob 03/10/2011,<br><br>               A minor child.<br><br>STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH, AND FAMILES,<br><br>               Respondent,<br><br>     v.<br><br>JANIECE THOM,<br><br>               Appellant. | No. 80254-2-I<br>(Consolidated with No. 80253-4-I)<br><br>DIVISION ONE<br><br><br><br>UNPUBLISHED OPINION |

BOWMAN, J. — Janiece Thom appeals from an order terminating her parental rights to L.A.T.-J. She claims the evidence was insufficient to support the court's finding that continuation of the parent-child relationship clearly diminishes the prospects for early integration into a stable and permanent home. She further asserts that the court's finding that termination was in the child's best interest was premature. Because substantial evidence supports the court's finding and the court properly considered the child's best interests, we affirm.

FACTS

L.A.T.-J. was born on March 10, 2011 and is the child of Janiece Thom and Joseph Head. Thom was the primary caretaker of L.A.T.-J.; he has never

Citations and pin cites are based on the Westlaw online version of the cited material.

lived with Head. In January 2017, the Department of Children, Youth, and Families (Department) removed five-year-old L.A.T.-J. from Thom's custody and filed a dependency petition. Head was incarcerated at the time for possession of methamphetamine. The Department placed L.A.T.-J. with his paternal grandparents and permitted both parents to have supervised visitation. L.A.T.-J. has not been in either parent's care or custody since his removal in January 2017.

The Department removed L.A.T.-J. from Thom's care due to her "serious mental health issues." According to medical records, Thom often exhibits psychotic-like behaviors, likely suffers from bipolar disorder, has not engaged in mental health treatment, and abuses methamphetamines. She has a documented history of claiming L.A.T.-J. has been abused when there is no evidence of abuse, and medical professionals believe she subjected L.A.T.-J. to "medical child abuse." Thom took L.A.T.-J. to multiple providers, claiming he had conditions such as brain damage, chlamydia, seizures, and autism. No medical evidence ever supported any of these claims. She was "aggressive" and "verbally abusive" to medical staff. Medical providers were also concerned that Thom gave L.A.T.-J. Adderall[1] when he was four years old, even after his doctor told her to stop, and that she continued to give L.A.T.-J. unnecessary medications. Visit supervisors observed Thom "infantilizing" L.A.T.-J., such as giving him a pacifier and talking to him "in baby-like tones," and on one occasion, she gave him a phone containing sexual photographs.

---

[1] Adderall is a mixture of amphetamine derivatives used to treat attention deficit disorder.

In March 2017, Head agreed to an order establishing dependency. He agreed that the services ordered were "necessary and appropriate" and that he must address his pending legal issues, substance abuse issues, domestic violence issues, and mental health concerns before he can be in a position to parent L.A.T.-J. safely. The order provided for supervised telephone visitation weekly while incarcerated and supervised visitation twice weekly once released.

In April 2017, the Department sought to modify Thom's visitation. It claimed that the visits were

> detrimental to [L.A.T.-J.] due to the aggressive behaviors of his mother, the unpredictability of her actions, the trauma associated with police intervention, and [him] watching the escalation of his mother with professionals and collaterals, as well as with law enforcement.

The police responded to visits between Thom and L.A.T.-J. on six different occasions, either called by the person supervising the visit or Thom herself. A variety of Thom's behavioral issues gave rise to the police interventions, including when Thom became "extremely agitated" and insisted L.A.T.-J. needed immediate medical attention; when she gave L.A.T.-J. a phone with "inappropriate" content; when she tried to leave with L.A.T.-J. and threatened the visit supervisor; when a supervisor ended the visit because Thom was belittling, interrogating, and antagonizing L.A.T.-J; and when Thom yelled at her social worker and accused him of "being drunk."

Another time, the social worker cancelled a visit after Thom showed up at L.A.T.-J.'s school with two men and said she wanted to have a " 'play date' " with him. When the school principal told her that she knew she could not remove

L.A.T.-J. from school, she seemed surprised and left. While she was in her sister's car on the way to the visit location, Thom learned the social worker cancelled the visit and " 'jumped' " out of the car. The sister called 911 and police found Thom outside the visit location. Thom called the social worker, demanding L.A.T.-J. be transported to the visit, and said L.A.T.-J. " 'is going home with me today.' " The school principal also reported that L.A.T.-J. acted out in class on the days he visits with Thom.

In May 2017, the court suspended Thom's visitation. The court found that suspension of Thom's visits was necessary to protect L.A.T.-J.'s health, safety, and welfare and appointed a guardian ad litem (GAL) for Thom. In September 2017, the court found Thom incompetent, confirmed the appointment of Susan Harness as her GAL, and set a fact-finding hearing date for October.

Following the fact-finding hearing, the court found L.A.T.-J. dependent as to Thom. The court found that "the mother has significant mental health issues that impair her ability to provide adequate care for the child." The court ordered Thom to participate in services offered by the Department, including a drug and alcohol evaluation, random urinalysis, parenting classes, and a psychiatric evaluation with a parenting component. The Department made considerable efforts to engage Thom in the services but she did not follow through.

L.A.T.-J. remained with his paternal grandparents throughout the dependency proceedings, though they made clear that they were not a long-term placement for him. They "wanted to maintain their role as grandparents" but did not want to "continue to be full-time caregivers." In late April 2018, the

4

Department placed L.A.T.-J. in a foster home where he resided until November 2018.

On May 11, 2018, the Department filed a petition to terminate both parents' relationships with L.A.T.-J. The Department reported that neither parent engaged in services and asserted that both were "currently unfit to parent." The Department alleged Thom's whereabouts were unknown, she had "significant mental health issues" that required long-term treatment, and she could not safely parent the child. The Department further alleged Head was incarcerated at the time for violating a no-contact order with Thom, had not verified completion of a drug and alcohol evaluation, and was incapable of safely parenting the child.

In September 2018, Head was released from prison. He relapsed a month later and used methamphetamine. He was later arrested for using cocaine. In November 2018, the Department placed L.A.T.-J. in a foster home in Kennewick, where he remained throughout the termination proceedings.

In February 2019, Head had his first in-person visit with L.A.T.-J. in approximately two years. Head thought the visit "went well" and said he " 'just want[ed] to be a part of his life.' " But L.A.T.-J.'s foster parents reported that after the visit, L.A.T.-J. was "very emotional and upset," acting out on the ride home. L.A.T.-J. said he did not want to visit his dad again but would talk to him on the phone.

In March 2019, Head was arrested for using methamphetamine and opiates. He was arrested again in early April 2019. He was in custody for a

parole violation related to those arrests when the fact-finding on the termination began.

The fact-finding hearing began April 24, 2019. After three days of testimony, the court recessed, and then resumed proceedings on May 20, 2019. By that time, Head was in an inpatient treatment program and testified telephonically. Thom did not appear for the termination fact-finding but counsel appeared on her behalf.

Thom's GAL Susan Harness testified that she had sporadic contact with Thom. Harness met with Thom once or twice, had four or five e-mail exchanges, and had one phone conference with her. The phone conference was in February 2019 and was the last contact she had with Thom. Harness did not know where Thom lived and believed she was homeless. During their brief interactions, Harness described Thom presenting as mentally ill. Thom believed that the Department illegally deprived her of her child and that L.A.T.-J. was taken as a result of "mistaken identity." Harness testified that she would be concerned about L.A.T.-J.'s safety if the Department returned him to Thom's care.

Department social worker Katie Kemper testified that Thom never acknowledged a need for services or any parental deficiencies and that she did not comply with any ordered services. Kemper also testified that Head seemed to avail himself of services available in the prison, but L.A.T.-J. still refused to have visits with him.

Kemper further testified that L.A.T.-J. was currently in a foster home that specialized in children with "challenging behaviors." L.A.T.-J. had ongoing

behavior issues and struggled in previous placements. At the time of the fact-finding, L.A.T.-J. had diagnoses of post-traumatic stress disorder, attention deficit hyperactivity disorder, and depression and his current treatment included medication and weekly therapy. The foster parents indicated that they wanted to be an adoptive placement for L.A.T.-J. Kemper recommended that L.A.T.-J. continue in this placement and did not think that L.A.T.-J. would need to be moved pending an adoption.

According to L.A.T.-J.'s court-appointed special advocate Hanna Patterson, eight-year-old L.A.T.-J. said he was happy with his current foster placement and, " 'I want to live here the rest of my life.' " He also said he did not want to live with his dad but it was okay to talk to him and visit. L.A.T.-J. told Patterson that he also wanted to have a visit with his mom and that he missed her.

Following the fact-finding hearing, the court granted the petition to terminate Thom's parental rights. The court denied the petition to terminate Head's parental rights. The court noted Head was currently in treatment and "at this point, it does seem that he is attempting to avail himself of what is available." Thus, the court could not find there was clear, cogent, and convincing evidence that (1) there was little likelihood that conditions would be remedied so that L.A.T.-J. could be returned to Head in the near future or that (2) continuation of the parent-child relationship clearly diminished the prospects for early integration into a stable and permanent home.

Thom appeals.

ANALYSIS

Where the trial court has weighed the evidence in a proceeding to terminate parental rights, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. In determining whether substantial evidence supports the trial court's findings, we do not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). We treat unchallenged findings as verities on appeal. P.D., 58 Wn. App. at 30.

To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The Department must first prove the statutory elements set forth in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. K.N.J., 171 Wn.2d at 576-77. Evidence is clear, cogent, and convincing if it establishes the ultimate fact in issue as " 'highly probable.' " In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)[2] (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). If the trial court finds that the

---

[2] Internal quotation marks omitted.

Department has met its burden under RCW 13.34.180(1), it may terminate

parental rights if it also finds by a preponderance of the evidence that termination

is in the "best interest" of the child.  K.N.J., 171 Wn.2d at 577; In re Welfare of

A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

> The six statutory elements the Department must prove are as follows:
>
> (a)  That the child has been found to be a dependent child;
> (b)  That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c)  That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d)  That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e)  That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . ; and
> (f)  That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

Thom does not dispute that the Department proved elements (a) through

(e) of RCW 13.34.180(1).  She contends that the Department failed to prove

element (f), that the "continuation of the parent and child relationship clearly

diminishes the child's prospects for early integration into a stable and permanent

home."  RCW 13.34.180(1).  She further contends that without proof of RCW

13.34.180(1)(f), the court's finding that termination was in L.A.T.-J.'s best

interests was premature.  We disagree.

Element (f) of RCW 13.34.180(1) can be established by proof either that (1) prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement or that (2) the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement.  In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013).

> RCW 13.34.180(1)(f) focuses on "the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home.  The [Department] does not have to prove that a stable and permanent home is available at the time of termination."

In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013) (quoting In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999)).  "[T]his factor is mainly concerned with the continued effect of the legal relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources."  In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004).

Here, substantial evidence established that L.A.T.-J. had prospects for integration into a stable and permanent home.  His placement at the time of trial was with a family who requested to be a permanent placement for him, and L.A.T.-J. said he wanted to live there "for the rest of his life."  The social worker opined that he would not need to move from this placement pending any adoption efforts.

Thom asserts that the court's simultaneous ruling denying termination of Head's parental rights prevents the Department from establishing RCW

13.34.180(1)(f) because the ruling effectively takes adoption off the table by "indefinitely delaying adoption by that [family]" and "undermin[ing] [L.A.T.-J.]'s prospects for adoption by the current foster home." But, as discussed, RCW 13.34.180(1)(f) does not require that the Department prove that a stable and permanent home is available at the time of termination. K.D.S., 176 Wn.2d at 658; K.S.C., 137 Wn.2d at 927. Moreover, RCW 13.34.200(1) specifies that the "rights of one parent may be terminated without affecting the rights of the other parent." And as the Department points out, there is nothing in the termination statute that prevents a court from terminating one parent's rights while leaving the other parent's rights intact.

Here, termination of Thom's parental rights enhances the likelihood of L.A.T.-J.'s early integration into a permanent home even where Head's rights are still intact. Thom's inability to assert a legal claim allows the foster family to focus on L.A.T.-J.'s needs without any uncertainty about Thom's parental rights. And should Head's efforts to restore custody fail, L.A.T.-J. does not have wait for Thom to undergo the termination process before proceeding with adoption. See In re Dependency A.V.D., 62 Wn. App. 562, 570, 815 P.2d 277 (1991) (terminating father's parental rights was necessary to allow integration into stable and permanent environment rather than imposing a guardianship that the father could later seek to terminate, necessarily keeping the child in limbo). Indeed, the court urged that the matter "be fast-tracked," noting that "Mr. Head has an opportunity to either comply now that he's out of custody or not. And if he's not going to do it, then it seems like something needs to happen."

Additionally, the facts supporting the court's conclusion that there is little likelihood that conditions will be remedied so that the child can be returned to the mother in the near future (RCW 13.34.180(1)(e)) also support the court's conclusion that continuation of their parent-child relationship clearly diminishes L.A.T.-J.'s prospects for early integration into a stable and permanent home (RCW 13.34.180(1)(f)). As our Supreme Court has recognized, "Facts supporting a conclusion under RCW 13.34.180(1)(e) may, but do not necessarily, also support a conclusion under RCW 13.34.180(1)(f)." K.D.S., 176 Wn.2d at 655; see In re Dependency of J.C., 130 Wn.2d 418, 426-27, 924 P.2d 21 (1996).

In K.D.S., the court held there was sufficient evidence that the continued parent-child relationship harmed the child's well-being where the father could not grasp the child's needs or understand the impact of his behavior on her health, and these aspects of his personality put the child's physical safety at risk. K.D.S., 176 Wn.2d at 658. In doing so, the court clarified and cited to J.C.:

> In J.C., for example, the fact that the mother was unlikely to change behaviors that had psychologically destabilizing effects on her children also supported a determination that continuation of their relationship clearly diminished the likelihood that the children would be emotionally and psychologically prepared to integrate into a stable and permanent home if and when one became available. Indeed, this would explain our conclusion in J.C. that an adequate showing of the allegation made pursuant to . . . RCW 13.34.180[(1)(e)] led to a necessary finding of the allegation under . . . RCW 13.34.180[(1)(f)].

K.D.S., 176 Wn.2d at 655-56. The court further noted the evidence that the child's outbursts had declined due to current structure and care. K.D.S., 176 Wn.2d at 658-59.

Here, the court concluded that there is little likelihood of remedial action based on the unchallenged findings that Thom's unaddressed mental health issues prevent her from safely parenting L.A.T.-J., that she cannot grasp L.A.T.-J.'s needs, and that she does not understand the impact her behavior has on his health and safety:

> The mother's parenting deficiencies include serious mental health issues that impair her ability to provide adequate care to the child. She was found to be incompetent, and a guardian ad litem was appointed . . . . The mother lacks insight into her parental deficiencies, and has shown no genuine interest in pursuing remedial services.
>
> . . . The mother is currently unfit to parent.
>
> The mother's current whereabouts are unknown; she has not maintained contact with the Department, and she is not engaged in any services. She is homeless and has been in and out of jail while the dependency case has been pending. Her visitation with the child was suspended on May 11, 2018, and she has not visited the child since that date. The court found the suspension was necessary to protect the child's health, safety, and welfare. The mother does not understand and is incapable of providing for the child's emotional, physical, mental, and developmental needs. The mother is incapable of safely parenting the child.

These unchallenged findings are verities on appeal.[3] The court also heard evidence that L.A.T.-J. "has made excellent positive changes in his school performance and behaviors since moving to Kennewick." Thus, as in J.C. and K.D.S., substantial evidence supports the court's conclusion that continuation of Thom and L.A.T.-J.'s relationship clearly diminishes his prospect for early integration into a stable and permanent home.

---

[3] P.D., 58 Wn. App. at 30.

Because the evidence is sufficient to establish element (f) of RCW 13.34.180(1), the court properly considered L.A.T.-J.'s best interests. The court's finding that the termination is in his best interests was not premature. We affirm the termination of Thom's parental rights to L.A.T.-J.

Brumm, J

WE CONCUR:

Appelwick, J.