IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to: | ) | No. 37867-5-III |
| | ) | |
| G.C. | ) | UNPUBLISHED OPINION |
| | ) | |

PENNELL, C.J. — D.C. appeals an order terminating his parental rights to his 12-year-old son G.C. We affirm.

BACKGROUND

G.C. was born to D.C. (father) and J.B. (mother) in the summer of 2009. G.C. initially lived with his mother but when he was 22 months old, the Department of Children, Youth, and Families placed him with his father. Before he turned three years old, G.C. had been diagnosed with type 1 diabetes, autism, and attention deficit hyperactivity disorder (ADHD).

G.C.'s medical and mental health conditions make him a labor-intensive child. He requires nearly constant blood sugar monitoring and insulin/diet management. G.C. often attempts to eat things that negatively impact his diabetes. He has poor verbal communication skills and behavioral outbursts that are difficult to manage.

On December 9, 2015, the Department filed a dependency petition for G.C. based on D.C.'s parental deficiencies, which included substance abuse and inattention to G.C.'s special needs. At the time the petition was filed, G.C.'s mother did not have visitation and appeared to have no involvement in G.C.'s life. In 2016, D.C. stipulated to a finding of dependency. As a result, G.C. was returned to D.C.'s home and D.C. agreed to participate in services, including random drug testing and treatment, mental health counseling, and training on G.C.'s medical needs. The Department and D.C. also developed an action plan that required D.C. to engage with Behavioral Rehabilitation Services for wraparound support, including in-home training and assistance attending to G.C.'s special needs.

For about six months, D.C.'s return to his father's home appeared successful. G.C.'s medical providers reported he was thriving under his father's care and attending all his appointments. At the first review hearing in May 2016, the court found D.C. to be compliant with services and that he was making progress toward correcting the issues that

caused G.C.'s removal. In June 2016, D.C. successfully completed chemical dependency treatment and was working with a public health nurse on management of G.C.'s diabetes.

In late summer 2016, D.C.'s progress stalled. Although D.C. initially engaged with Behavioral Rehabilitation Services, over time his participation waned and he stopped services in July 2016. Then, on August 14, 2016, D.C. brought G.C. to the emergency room at Sacred Heart Medical Center, reported G.C.'s blood sugar was high, and left G.C. at the hospital. That afternoon, law enforcement arrested D.C. for assaulting his neighbor and placed D.C. in custody at the Geiger Corrections Center in Airway Heights.

The Department then placed G.C. in a supportive care group home. At the next review hearing in September, the court found D.C. was noncompliant with services and not making progress toward correcting the problems that caused the child's removal. G.C. visited D.C. once at Geiger, with accommodation for direct interaction because of G.C.'s special needs.

In late 2016, D.C. pleaded guilty to third degree assault and was released from Geiger. D.C. expressed a desire to reengage in services and visited G.C. regularly at his group home. However, at the next review hearing in February 2017 the court again found D.C. to be noncompliant with services and not making progress toward correcting the problems that caused the child's removal. D.C. asked the Department to consider his

mother, G.C.'s grandmother, for placement and potential adoption or guardianship. The Department and the State of California, where D.C.'s mother lived, eventually approved G.C.'s placement with his grandmother.

G.C.'s time in California was short-lived. After about one and one-half months, G.C.'s grandmother concluded she was not going to be able to adequately meet G.C.'s special needs. G.C. was returned to Spokane and moved into a group home named Apple Brooke, where staff were available for 24-hour supervision. G.C. has continued to live at Apple Brooke ever since.

In the fall of 2017, D.C. was arrested and charged with murdering G.C.'s mother, J.B. He also faced a charge of possessing methamphetamine. While pending trial, D.C. was evaluated at Eastern State Hospital. During his time at Eastern, D.C. was alleged to have attacked and strangled a staff member there. At the time of the termination trial, the assault charge was still pending.

During the pendency of D.C.'s murder case, the juvenile court cancelled all visitation between D.C. and G.C. The Department and G.C.'s providers had concerns that jail visits would upset G.C. since he was uncomfortable in small spaces and around loud noises. G.C.'s providers also decided it was best not to explain the details behind D.C.'s incarceration. Instead, G.C. was told that he was not going to be able to see D.C.

4

for a while because of a mistake D.C. had made. G.C. has since never asked about D.C. or requested to speak with him.

Despite his incarceration, D.C. tried to keep in contact with G.C. through letters and drawings. The letters were withheld from G.C., but he was provided with the drawings. Although the Department deemed the letters appropriate, G.C.'s providers were concerned with G.C.'s ability to manage his emotions regarding contact with his father.

The juvenile court continued with regular review hearings and consistently found D.C. noncompliant with services. D.C. could not participate in services while at the Spokane County jail because service providers, whether contracted with the Department or not, could not offer services where he was incarcerated. The only services offered at the jail allowed inmates to arrange chemical dependency evaluations and treatment prior to their release. While at Eastern State Hospital, D.C. did partake in some services offered by the hospital, including counseling and therapy.

In the spring of 2019, the Department filed a petition to terminate the parent-child relationship between D.C. and G.C. Trial took place in the fall of 2020, shortly after a jury convicted D.C. of second degree murder and possession of methamphetamine. D.C. received a sentence of 268 months as a result of his murder conviction.

D.C. represented himself at the termination trial. During trial, D.C. denied that he had a problem with anger, violence or controlled substances. D.C. recognized that he would be unable to have physical custody of G.C. in light of his incarceration. Nevertheless, D.C. asked that he be able to exercise his rights as an incarcerated parent so that G.C. would remain at Apple Brooke until he turned 21. D.C. explained that he wanted to continue to have contact with G.C., be it in the form of video conferences, phone calls, or letters. D.C. voiced concern that the Department was discriminating against him based on his status as an incarcerated person.

At the conclusion of trial, the court terminated D.C.'s parental rights to G.C. Relevant to this appeal are the court's following findings of fact:

> 9. The Court finds pursuant to RCW 13.34.130 that services have been offered to the father to address and correct the parental deficiencies that were identified at the outset of the dependency. Services court-ordered under RCW 13.34.130 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting parental deficiencies within the foreseeable future have been offered or provided including the following:
>
> > a. A chemical dependency assessment and treatment were offered. [D.C.] was found in that assessment to have mild alcohol use disorder, and treatment was recommended as part of that assessment. During the assessment and treatment, the father only self-reported substance issues, which were minor and related to alcohol, and he completed treatment for alcohol use only. It certainly became clear in this case that more than alcohol use was at the root of a chemical dependency issue.

b. [D.C.] was also provided individual mental health counseling, which he participated in but never fully completed. He did not make progress toward remedying the parenting deficiencies related to his mental health.

c. [D.C.] was provided training and education to assist with managing [G.C.'s] autism, Diabetes Type 1, conduct disorder, and ADHD. He engaged with [G.C.'s] medical providers early in the case, but later in the dependency (prior to the homicide), he chose to self-terminate those services. He was provided with UA/BA [urinalysis/blood alcohol] testing for substance abuse compliance, and he was provided bus passes to assist with transportation to and from services.

d. [G.C.] was initially placed in his father's care, and during that time [D.C.] was provided in-home assistance and respite care. Behavior Rehabilitation Services (BRS) counselor Kara Winkleman worked with [D.C.] in his home to assist with behavior interventions for [G.C.], given his special needs related to autism, conduct disorder, and ADHD. [D.C.] chose to stop working with the BRS provider in July of 2016.

. . . .

15. During the periods of time throughout the dependency action when [D.C.] was incarcerated, he was detained in locations where services were not reasonably available that could have remedied his parental deficiencies.

16. The Court finds there was a reasonable basis not to provide [D.C.] with visits while he was in detention in the Spokane County jail due to [G.C.'s] special needs, autism, disruptive behaviors, difficulty making transitions, previous poor reactions to small and confined spaces, and more recently the risk of exposure to COVID-19. There are a number of reasons why it was not in [G.C.'s] best interests to transport him for in-person visits at the jail during the pendency of the case leading up to the murder conviction.

. . . .

21.   The Court has considered whether the father has maintained a meaningful role in the child's life, using the factors provided in RCW 13.34.145(5)(b). The father attempted to maintain a meaningful role in [G.C.'s] life after he was arrested by sending him letters and artwork. However, those attempts were not meaningful from [G.C.'s] perspective due to his developmental limitations. [G.C.] did not ask about, or ask to see, his father. [G.C.] requires a regular routine and disruptions to his schedule have a negative impact on his ability to engage in school, his physical welfare, and his emotional welfare. Due to [G.C.'s] behavioral and medical issues, it was not in [G.C.'s] best interests to have in-person contact with his father while he was incarcerated on the murder charge. Moving forward, it is not in [G.C.'s] best interests to maintain a relationship with his father.

Clerk's Papers (CP) at 515-18.

The juvenile court noted that its disposition was not a "punitive decision" against D.C. 2 Report of Proceedings (RP) (Nov. 10, 2020) at 77-78. It concluded the six elements of RCW 13.34.180(1) had been met and that it "considered the factors identified in RCW 13.34.145" and determined that D.C. had not maintained a meaningful role in G.C.'s life. CP at 519. As a result, the court declared it was not in G.C.'s best interest to maintain a relationship with D.C. and that the parent-child relationship should be terminated.

D.C. now appeals the termination order.

ANALYSIS

Termination of parental rights involves a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents" and requires the Department to prove by clear, cogent, and convincing evidence, the six termination factors set forth in RCW 13.34.180(1). *Id*. If this burden is met, termination may be ordered if the Department establishes, by a preponderance of the evidence, that termination is in the best interest of the child. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

D.C.'s appeal turns on the first step of the process. He challenges two of the statutory termination factors:

- The requirement under RCW 13.34.180(1)(f) "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home;" and

- The requirement under RCW 13.34.180(1)(d) that the Department has offered or provided "all necessary services, reasonably available, capable of correcting" parental deficiencies "within the foreseeable future."

We review the juvenile court's decision for substantial evidence in light of the demanding standard of proof. *In re Parental Rights to B.P.*, 186 Wn.2d 292, 313, 376 P.3d 350 (2016).

*RCW 13.34.180(1)(f)*

RCW 13.34.180(1)(f) looks to interplay between the time needed by a parent to address parenting deficiencies and the child's prospects for permanency. When a parent is incarcerated at the time of a termination trial, special considerations are required. Specifically, "the court shall consider [1] whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); [2] whether the department made reasonable efforts as defined in this chapter; and [3] whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child." RCW 13.34.180(1)(f).

The goal of RCW 13.34.180(1)(f)'s incarceration factors is "to require [juvenile] courts to consider whether an incarcerated parent [can] maintain a meaningful role . . . in the child's life and to require [the Department] to make reasonable efforts to help the incarcerated person remedy parental deficiencies." *In re Parental Rights to M.J.*, 187 Wn. App. 399, 408, 348 P.3d 1265 (2015). "The statute notably does not mandate that a

10

certain weight be afforded to the incarceration" factors. *In re Parental Rights to E.D.*, 195 Wn. App. 673, 695, 381 P.3d 1230 (2016). Nor is the juvenile court required to make express findings. *In re Parental Rights to K.J.B.*, 187 Wn.2d 592, 594, 387 P.3d 1072 (2017). All that is required is that the three incarceration factors be "considered." *Id.*

D.C. makes two arguments regarding the incarceration factors. First, he claims the juvenile court considered only the first incarceration factor (meaningful role), not factors two (reasonable efforts) and three (barriers). Second, D.C. argues the juvenile court misconstrued the first factor by focusing on G.C.'s perspective of whether there was a meaningful role for D.C. in G.C.'s life. We disagree on both fronts.

The juvenile court considered the second factor (reasonable efforts) when assessing RCW 13.34.180(1)(d) (requiring the Department to prove the provision of all reasonably necessary services). Nothing in RCW 13.34.180(1)(f) prohibits the court from taking into account evidence submitted in support of RCW 13.34.180(1)(d). *See In re Dependency of K.D.S.*, 176 Wn.2d 644, 656, 294 P.3d 695 (2013) ("Evidence may support more than one element found within RCW 13.34.180(1)."). This case is dissimilar to *K.J.B.*, where the juvenile court appeared to apply an outdated version of the termination statute that did not require consideration of the incarceration factors. *See* 187 Wn.2d at 604-06. Here, the juvenile court explicitly recognized the existence

11

of the incarceration factors and adequately considered the reasonable efforts component

of RCW 13.34.180(1)(d) when assessing RCW 13.34.180(1)(f).

The record on review reveals the juvenile court also considered barriers to

communication and visitation as contemplated by the third incarceration factor. The

court's findings noted "there was a reasonable basis not to provide [D.C.] with visits

in the jail cell due to [G.C.'s] special needs, the autism, his disruptive behavior, also

the small and confined spaces that he had had previous poor reactions to and there was

also COVID." 2 RP (Nov. 10, 2020) at 78-79. The court also considered the barriers to

therapeutic services stemming from the lack of available services at the Spokane County

jail and Eastern State Hospital. Thus, the juvenile court adequately considered the third

incarceration factor.

D.C. argues the juvenile court committed legal error in its assessment of the first

incarceration factor. Specifically, D.C. claims the court should have assessed whether he

had maintained a meaningful role in G.C.'s life from D.C.'s perspective, not from G.C.'s

perspective. The Department answers that the juvenile court properly analyzed the first

incarceration factor by looking at whether the parent's role was meaningful to both the

parent and the child. We agree with the Department.

The overarching consideration under RCW 13.34.180(1)(f) is whether continuation of the parent-child relationship "clearly diminishes the child's prospects" for a permanent and stable home. This is a child-focused consideration. As pointed out by D.C., the first incarceration factor includes a cross-reference to RCW 13.34.145(5)(b), which lists numerous actions an incarcerated parent can take to maintain a meaningful role in the child's life. However, the focus in RCW 13.34.145(5)(b) is still on the "child's life." Questions regarding whether or not an individual is a fit parent are child-specific. *See In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 492-93, 379 P.3d 75 (2016). The juvenile court's assessment of whether D.C. maintained a meaningful role in G.C.'s life properly considered G.C.'s perspective.

*RCW 13.34.180(1)(d)*

RCW 13.34.180(1)(d) requires the Department to prove that "services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." Necessary services may include "individual, group, and family counseling; substance abuse treatment services; mental health services; assistance to address domestic

13

violence; services designed to provide temporary child care and therapeutic services for families." RCW 13.34.025(2)(a).

For the first time on appeal, D.C. claims the Department should have provided him with services focused on how he could better communicate with G.C. while in custody. He argues provision of such services would have addressed the lack of attachment between himself and G.C.

To the extent D.C.'s argument is preserved, it is inapt. The barriers to communication caused by D.C.'s incarceration were not rooted in D.C.'s limited skill set. The problems were specific to G.C.'s special needs, including his vulnerability to overstimulation and psychological harm. They were also attributable to the reasons for D.C.'s incarceration, including the fact that D.C. was convicted of killing G.C.'s mother. No amount of parenting services would have helped eliminate the risks to G.C. posed by resuming communications with D.C. D.C.'s challenge to the adequacy of the Department's services fails.

## CONCLUSION

When a parent is in custody at the time of a termination trial, the juvenile court must consider the statutory incarceration factors set forth in RCW 13.34.180(1)(f). But fair consideration of the incarceration factors must not be to the detriment of the

dependent child. Where, as here, the parent's incarceration will extend well past the child's 18th birthday, the child "should be free to move on with [his] life," unencumbered by the dependency process. *In re Welfare of H.S.*, 94 Wn. App. 511, 530, 973 P.2d 474 (1999).

Given his lengthy incarceration, D.C. has no realistic possibility of resuming custody of G.C. Indefinite dependencies are contrary to Washington law. The order terminating D.C.'s parental rights is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, C.J.
Pennell, C.J.

WE CONCUR:

_____
Siddoway, J.

_____
Fearing, J.